**UNITED SENIORS ASSOCIATION, INC., As a Private Attorney General, Plaintiff, Appellant,**

v.

**PHILIP MORRIS USA, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Individually and as the Successor to the American Tobacco Company, Lorillard Tobacco Company, and Liggett Group, Inc., Defendants, Appellees.**

No. 06–2447.

United States Court of Appeals, First Circuit.

Heard March 6, 2007.

Decided Aug. 20, 2007.

Robert J. Cynkar, with whom Joseph R. Egan, Charles J. Fitzpatrick, Egan, Fitz-patrick, Malsch & Cynkar, PLLC, Christopher Weld, Jr., Kevin T. Peters, Raymond P. Ausrotas, Todd & Weld LLP, Jonathan W. Cuneo, Michael G. Lenett, and Cuneo, Gilbert & LaDuca, LLP, were on brief for appellant.

Richard B. Rosenthal, with whom Brian Stuart Kaukautchos was on brief for amicus.

Murray R. Garnick, with whom Arnold & Porter LLP, Robert A. McCarter III, Geoffrey J. Michael, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Thomas E. Peisch, and Erin K. Higgins, were on brief for appellees.

Before BOUDIN, Chief Circuit Judge, CYR, Senior Circuit Judge, and HOWARD, Circuit Judge.

CYR, Senior Circuit Judge.

United Seniors Association, Inc. ("United Seniors"), a nonprofit taxpayer advocacy group, appeals from a district court judgment dismissing its claims pursuant to the Medicare Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A), to force five tobacco companies to reimburse the federal Medicare program for the monies it has expended since 1999 for the medical treatment of persons suffering from smoking-related illnesses. The district court concluded that United Seniors could not file such a private § 1395y(b)(3)(A) cause of action for reimbursement before the tobacco companies' financial responsibility to pay for the Medicare beneficiaries' medical expenses had been determined by a judgment, compromise, waiver, or a release from the beneficiaries of their insurance claims against the companies, or some other comparable means. *United Seniors Ass'n v. Philip Morris USA,* No. 05–11623, 2006 WL 2471977, at *3–4 (D.Mass. Aug. 28,

2006). We affirm the judgment of dismissal, albeit on another ground.

# I

## BACKGROUND

### A. The MSP Statute

Prior to 1980, Medicare generally paid for medical services whether or not the Medicare beneficiary also was covered by another health plan. *See Fanning v. United States*, 346 F.3d 386, 388 (3d Cir. 2003) (citing Social Security Amendments of 1965, Pub.L. No. 89–97, § 1862(b), 79 Stat. 286). The MSP statute, which was enacted in 1980 to reduce federal health care costs, makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer. *See United States v. R.I. Insurers' Insolvency Fund*, 80 F.3d 616, 618 (1st Cir. 1996) (citing H.R.Rep. No. 96–1167, at 389 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5526, 5752); *see also Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1306–07 (11th Cir.2006).

To that end, the MSP statute prohibits Medicare from making any payment to a beneficiary for medical expenses if "payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) under … an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance." *R.I. Insurers' Insolvency Fund*, 80 F.3d at 618 (quoting 42 U.S.C. § 1395y(b)(2)(A)(i)). Should Medicare determine that the primary insurer has not paid and that no prompt payment reasonably can be expected from the primary insurer, however, Medicare may pay the beneficiary up front, but such payment is conditioned on Medicare's right to reimbursement in the event that a primary plan later pays or is found responsible for payment of the item or service. *See id.* (citing 42 U.S.C. § 1395y(b)(2)(B)).[1]

To facilitate recovery of these conditional payments, the MSP (i) provides for a government action against any entity responsible for payment under a primary plan, 42 U.S.C. § 1395y(b)(2)(B)(iii);[2] (ii) subrogates the United States to the rights of a Medicare beneficiary to collect payment under a primary plan for items al-

---

1. The reimbursement provision reads:

    A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

    42 U.S.C. § 1395y(b)(2)(B).

2. Section (b)(2)(B)(iii), entitled "Action by United States," provides, in pertinent part:

    In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity. In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity.

ready paid by Medicare, § 1395y(b)(2)(B)(iv) ("The United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan."), and (iii) creates a private cause of action with double recovery to encourage private parties to bring actions to enforce Medicare's rights, § 1395y(b)(3)(A) ("There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).").[3] The present case implicates only the private cause of action provision.

## B. *United Seniors' Lawsuit*

On August 4, 2005, United Seniors filed the instant action against five major tobacco companies in Massachusetts federal district court, demanding reimbursement for all smoking-related Medicare costs incurred since 1999,[4] and also alleging that the tobacco companies were liable for the tort of battery. Plaintiff's complaint does not allege that any of its members are Medicare beneficiaries who were treated

for smoking-related injuries, but simply invokes the private-cause-of-action provision set forth in § 1395y(b)(3)(A). Plaintiff contends that § 1395y(b)(3)(A) is available to any person who seeks to force a primary insurer to reimburse costs to Medicare, not only to affected Medicare beneficiaries.

Defendants moved to dismiss the complaint on three grounds: (i) United Seniors, which does not allege that any of its members were Medicare beneficiaries treated for smoking-related illnesses, possesses neither Article III nor statutory standing to maintain a § 1395y(b)(3)(A) reimbursement suit; (ii) United Seniors was in privity with the losing plaintiff in *Glover*, 459 F.3d at 1309; *see supra* note 4, and consequently is collaterally estopped from relitigating the defendants' reimbursement obligations to Medicare; and (iii) United Seniors failed to allege that defendants' financial responsibility for unreimbursed Medicare costs had been established previously by judgment, compromise, waiver, nor by a release from the beneficiaries of their insurance claims against the companies, nor by any other comparable means. On August 28, 2006, the district court dismissed the United Seniors complaint on the third ground alone, citing the rationale in *Glover*. *United Seniors*, 2006 WL 2471977, at *4.[5]

---

3. In 2001, the government's direct MSP reimbursement collection action against the major tobacco companies was dismissed in a related federal district court lawsuit, and the government has never sought to reinstate its claim. *See United States v. Philip Morris, Inc.*, 449 F.Supp.2d 1, 32 (D.C.C.2006).

4. United Seniors' complaint excludes Medicare beneficiaries residing in Florida. A separate § 1395y(b)(3)(A) lawsuit had been filed in Florida federal district court in behalf of Florida Medicare beneficiaries. However, as in this case, the court dismissed the complaint on the ground that plaintiffs did not establish that the tobacco companies' financial respon-

sibility to pay for the beneficiaries' medical expenses had been established through an earlier judgment or some other comparable means. *Glover*, 459 F.3d at 1309.

5. After the entry of judgment, United Seniors brought to the attention of the court the recently-issued opinion in *United States v. Philip Morris USA, Inc.*, 449 F.Supp.2d 1 (D.C.C. 2006) (finding that major tobacco companies violated the Racketeer Influenced and Corrupt Organizations Act by deceiving the public concerning the addictiveness of cigarettes and by manipulating their cigarettes' design to enhance addictiveness), arguing that its factual findings would serve as the requisite

## II

### *DISCUSSION*

The defendants' Article III and statutory-standing argument, which calls into question our subject-matter jurisdiction, rests on Federal Rule of Civil Procedure 12(b)(1). The federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case. *See United States v. Union Bank for Sav. & Inv.*, 487 F.3d 8, 22 (1st Cir.2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); *see also Davignon v. Clemmey*, 322 F.3d 1, 11 (1st Cir.2003) (holding that an appellate court remains free to bypass problematic jurisdictional issues provided those issues do not implicate the Article III "case or controversy" requirement); *Dubois v. United States Dep't. of Agric.*, 102 F.3d 1273, 1281 (1st Cir.1996); *accord In re Olympic Mills Corp.*, 477 F.3d 1, 6 (1st Cir.2007) (noting that " 'we have an obligation to inquire *sua sponte* into our jurisdiction over the matter' ") (citation omitted). We review *de novo* the district court's implicit legal conclusion that it had subject-matter jurisdiction to determine the merits of the complaint, *see Baella–Silva v. Hulsey*, 454 F.3d 5, 10 (1st Cir. 2006), and conclude that United Seniors lacks Article III standing.

Article III standing requirements "are expressed in a familiar three-part algorithm: a would-be plaintiff must demonstrate a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." *Me. People's Alliance & Natural Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). United Seniors, suing in its capacity as a nonprofit taxpayer advocacy group to vindicate the fiscal integrity of the Medicare program, utterly fails to meet this standard, in that it does not allege that it represents any particular Medicare beneficiary who received unreimbursed Medicare payments for treatment of smoking-related injuries. *See id.* (noting that an association has Article III standing only if its "individual members would have standing to sue in their own right"); *Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir.2005) ("[W]ith certain narrow exceptions not implicated here, taxpayers, as such, lack generalized standing to challenge the constitutionality of governmental action.") (citing *Frothingham v. Mellon*, 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).

In order to overcome this fatal defect, United Seniors argues that Congress sought to create a *qui tam* action in § 1395y(b)(3)(A). *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (holding that *qui tam* plaintiffs have Article III standing because they sue as partial assignees of the United States' claims against defendants). We find no evidence of such congressional intent.

There presently is no common-law right to bring a *qui tam* action, which is strictly a creature of statute. *See id.* at 776, 120 S.Ct. 1858; *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 84

---

"prior judgment" demonstrating the defendants' financial responsibility for Medicare beneficiaries' smoking-related health care expenditures. The district court summarily rejected the contention. As we affirm on an alternative ground, *see infra*, we do not address the relevance *vel non* of the RICO judgment.

(2d Cir.1972). " 'Qui tam ' is an abbreviation for *qui tam pro domino rege quam pro seipso,* which literally means 'he who as much for the king as for himself.' *Qui tam* provisions first became popular in thirteenth century England. They permitted private individuals to bring suit on behalf of the King and served as a supplement to official law enforcement." *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 224 n. 5 (1st Cir.2004) (citation omitted). For example, the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.,* a typical and commonly-invoked *qui tam* action, provides that "[a] person may bring a civil action . . . *for the person and for the United States.*" 31 U.S.C. § 3730(b) (emphasis added). Although the government remains the "real party in interest" in a *qui tam* prosecution, *Karvelas,* 360 F.3d at 231, *qui tam* statutes like the FCA "authorize[ ] private individuals to sue on behalf of the federal government and were intended to aid the government in discovering fraud and abuse 'by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government,' " *id.* at 224 (citation omitted). To encourage the efforts of these "private attorneys general," also known as "relators," *qui tam* statutes typically permit them to share—with the government—in the monetary recovery of the lawsuit. *See United States ex rel. S. Prawer and Co. v. Fleet Bank of Me.,* 24 F.3d 320, 324 (1st Cir.1994). As we noted, *supra, qui tam* relators, even those who were not personally injured by the defendant's actions, normally possess Article III standing because they sue as partial assignees of the United States' claims against the defendant. *See Vt. Agency of Natural Res.,* 529 U.S. at 773.

By contrast to FCA § 3730(b), MSP § 1395y(b)(3)(A) reads, in its entirety: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." No mention is made of any jointly-held cause of action by the government and the private plaintiff, or of the private plaintiff's right to sue solely in behalf of the government. Indeed, the MSP contemplates that the government has its own independent causes of action, either direct or in subrogation. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii), (iv); *supra* note 2.

Tellingly, Congress created the causes of action in FCA § 3730(b) and MSP § 1395y(b)(3)(A) during the *same month* in 1986,[6] and if it had meant unambiguously to create a *qui tam* action in the latter section, it readily could have used—but did not—the same explicit assignment language it employed in § 3730(b) (*viz.,* "a person may bring a civil action . . . for the person and for the United States") in § 1395y(b)(3)(A). *See Mullane v. Chambers,* 333 F.3d 322, 331 (1st Cir.2003) (consulting other statutes to ascertain that Congress knew how to include an express exclusion "and could have done so clearly and explicitly"); *accord Wood v. Spencer,* 487 F.3d 1, 6 (1st Cir.2007) ("Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (citation omitted).[7]

---

**6.** *Compare* Pub.L. No. 99–509, § 9319, 100 Stat. 1874 (1986), *with* Pub.L. No. 99–562, § 3, 100 Stat. 3153 (1986).

**7.** It is also particularly notable that the *Vermont Agency* Court did not list MSP § 1395y(b)(3)(A) as among the four *qui tam* statutes which "remain on the books." 529 U.S. at 768 n. 1, 120 S.Ct. 1858.

Furthermore, unlike the FCA and other *qui tam* statutes, MSP § 1395y(b)(3)(A) does not contemplate that the plaintiff share with the government in any monetary judgment. *Qui tam* statutes typically provide that the relator will receive, for example, a specific percentage of any recovery (or a "bounty"), with the remainder to go into the government coffers. *See, e.g.,* 31 U.S.C. § 3730(d)(1),(2) (authorizing FCA relator to recover 15–25% in a government-prosecuted case, and 25–30% in a self-prosecuted case); *see also Vt. Agency,* 529 U.S. at 777, n. 6, 120 S.Ct. 1858 (setting forth congressional history of *qui tam* "informer" statutes, all of which provide for a particular percentage share of the recovery to relator). By contrast, MSP § 1395y(b)(3)(A) provides that the plaintiff is entitled to the *entire* recovery. It not only fails to mention a percentage bounty, but makes no provision at all requiring the prevailing plaintiff to share the double damages award with the government. In order to recover part of the judgment, presumably the government would need to commence an independent lawsuit against the prevailing plaintiff pursuant to MSP § 1395y(b)(2)(B)(iii) or (iv). We cannot imagine that Congress intended the MSP to function as a *qui tam* statute in such an oblique fashion.

Finally, MSP § 1395y(b)(3)(A) fails to include any of the procedural mechanisms typical of *qui tam* statutes, which are predicated on the recognition that the government is the "real party in interest" in any *qui tam* prosecution. *See Karvelas,*

360 F.3d at 231. These special procedural limitations are designed to ensure that the government is to be kept informed and permitted to determine the extent to which it will participate in the litigation. *See Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 394 (2d Cir.2001).[8] Subsection 1395y(b)(3)(A) contains no such limitations, thus suggesting that the private plaintiff is meant to be the real party in interest.

United Seniors' only citations to the contrary are either inapposite or unpersuasive. In *Manning,* the court stated that FCA § 3730(b) and MSP § 1395y(b)(3)(A) "allow individual citizens, as well as the government, to sue in order to right an economic wrong done to the government ... [and] thus create 'private attorneys general' by authorizing private citizens to receive part of the recovery." 254 F.2d at 394. The *Manning* reference to "private attorneys general" is of little import. First, even assuming (as we do) that only Medicare beneficiaries can prosecute a private § 1395y(b)(3)(A) cause of action, those beneficiaries properly can be described as "private attorneys general" to the extent that their very power to sue coincidently serves a pro-government purpose: that of discouraging primary insurers from failing to reimburse Medicare and preventing depletion of the Medicare trust fund.

Further, the *Manning* court's above-quoted discussion arose in the more narrow and distinct context of determining which federal or state statute is "the most closely analogous" to the MSP, so that the MSP, which does not specify its own

---

**8.** The FCA contains the typical procedural safeguards. Prior to serving the complaint on the defendant, the relator must serve the complaint with the court under seal, disclose material evidence to the government, and thus allow the government an opportunity to conduct a preliminary investigation of the claim. *See* 31 U.S.C. § 3730(b)(2). The government then can choose to dismiss or settle the com-

plaint (even over the relator's objection), to intervene and assume control of the case (in which event it is not bound by the relator's acts or representations), or to notify the court that it will permit the relator to prosecute the case. *Id.* § 3730(b)(4). Finally, the government is entitled to between 70–85% of any monetary judgment. *Id.* § 3730(d).

statute of limitations, could "borrow" its limitations period. In the process of identifying the "many important similarities" between the FCA and the MSP, however, the *Manning* court also noted "procedural differences." The court observed, for example, that the MSP "creates a private right of action *for individuals whose medical bills are improperly denied by insurers*," whereas under the FCA, "a private citizen can sue to recover on a claim falsely submitted and paid by the United States, but such action is a relator action brought in the name of the government." *Id.* at 394–95 (emphasis added). The *Manning* court then concluded that, "[d]espite these procedural differences, the FCA 'clearly provides a closer analogy than [New York] state [statute of limitations] alternatives.'" *Id.* at 395 (citation omitted).[9]

Finally, United Seniors cites no other apposite or persuasive authority to refute the rationale employed in the recent unbroken line of cases which have rejected the argument that MSP § 1395y(b)(3)(A) is a *qui tam* statute.[10]

█ United Seniors further suggests that the defendants' "standing" argument erroneously implies that the FCA is the sole prototype of a *qui tam* statute, and ignores the fact that other *qui tam* statutes have exhibited a variety of different characteristics. United Seniors contends that no "magic words" are necessary to find a *qui tam* and that it should be sufficient that a statute authorizes a private plaintiff to sue, but that clearly cannot be the benchmark. Many statutes authorize private causes of action by persons harmed by particular conduct, but this characteristic alone would not create a *qui tam* effect. At the very least, *qui tam* statutes must make clear, whether expressly or by necessary implication, that the plaintiff is an assignee of the government entitled to sue in its behalf. Subsection 1395y(b)(3)(A) simply does not come close to suiting this basic profile.

## III

## *CONCLUSION*

As we conclude that United Seniors failed to establish Article III standing to bring an action under MSP § 1395y(b)(3)(A), we lack the requisite subject matter jurisdiction to reach the district court's determination on the merits. *See Steel Co.,* 523 U.S. 83, 94–95, 118

---

9. We also discount the United Seniors' citation to *Mason v. Am. Tobacco Co.,* 212 F.Supp.2d 88 (E.D.N.Y.2002), where the court stated that the MSP statute authorizes "a civil proceeding *similar to a qui tam* action." *Id.* at 94 (emphasis added). Notably, the court did not state that the MSP statute *was* a *qui tam* statute. Further, the issue was discussed obliquely in the context as to whether to grant the plaintiffs' motion for class certification, not in the context of the plaintiffs' Article III or statutory standing. Finally, the class certification issue arguably was mooted by the court's prior ruling that the defendant-tortfeasors were not a "primary plan" for purposes of the version of § 1395(b)(3)(A) then in effect. *Id.* at 93. On appeal, the court affirmed the district court on this latter ground alone, and did not reach or address the certification or the *qui tam* issues. *See Mason v. Am. Tobacco Co.,* 346 F.3d 36, 43 (2d Cir.2003).

10. *See, e.g., Stalley v. Regency Hosp. Co.,* No. 06–5233, 2007 WL 1702574 (W.D.Ark. June 11, 2007); *Brockovich v. Cmty. Med. Ctrs., Inc.,* No. 06–1609, 2007 WL 738691 (E.D.Cal. Mar. 7, 2007); *Stalley v. Erlanger Health Sys.,* No. 1:06–194, 2007 WL 672301 (E.D.Tenn. Feb. 28, 2007); *Stalley v. Catholic Health East,* No. 06–2491, 2007 WL 320271 (E.D.Pa. Jan. 30, 2007); *Stalley v. Sumner Reg'l Health Sys., Inc.,* No. 2:06–0074, 2007 WL 173686 (M.D.Tenn. Jan. 18, 2007); *Stalley ex rel. United States v. Catholic Health Initiatives,* 458 F.Supp.2d 958, 962–63 (E.D.Ark.2006).

S.Ct. 1003, 140 L.Ed.2d 210 (1998). Accordingly,

*The appeal is hereby dismissed.*