**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RODERICK MAGADIA, individually and on behalf of all those similarly situated, *Plaintiff-Appellee*, v. WAL-MART ASSOCIATES, INC., a Delaware corporation; WALMART INC., a Delaware corporation, *Defendants-Appellants*. | No. 19-16184 D.C. No. 5:17-cv-00062-LHK OPINION |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted November 19, 2020
Pasadena, California

Filed May 28, 2021

Before:  Consuelo M. Callahan and Patrick J. Bumatay,
Circuit Judges, and Gregory A. Presnell,[*] District Judge.

Opinion by Judge Bumatay

---

[*] The Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

## SUMMARY[**]

### Article III Standing / California Labor Law

In a class action suit brought by Roderick Magadia, a former Walmart employee, alleging violations of California Labor Code's meal-break and wage-statement requirements, the panel: (1) vacated the district court's judgment and award of damages on a Cal. Labor Code § 226.7 claim for meal-break violations and remanded with instructions to further remand the claim to state court; and (2) reversed the judgment and award of damages on two Cal. Labor Code § 226(a) claims for wage-statement violations and remanded with instructions to enter judgment for Walmart.

The panel held that Magadia lacked Article III standing to bring a California Private Attorney General Act ("PAGA") claim for Walmart's meal-break violations since he himself did not suffer injury. Specifically, the panel noted that *qui tam* actions are a well-established exception to the traditional Article III analysis, but held that PAGA's features diverged from *Vermont Agency of Nat. Res. V. U.S. ex rel. Stevens*, 529 U.S. 765 (2000)'s assignment theory of *qui tam* injury. The panel also held that PAGA's features departed from the traditional criteria of *qui tam* statutes.

The panel next considered whether Magadia had standing to bring his two wage-statement claims under Cal. Labor Code § 226(a), which requires employers to accurately furnish certain itemized information on its

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

employees' wage statements.  The panel held that a violation of § 226(a) created a cognizable Article III injury here.  To determine whether the violation of a statute constituted a concrete harm, the panel conducted a two-part inquiry.  First, the panel held that § 226(a) protected employees' concrete interest in receiving accurate information about their wages in their pay statements; and Walmart's failure to disclose statutorily required information on Magadia's wage documents, if true, violated a "concrete interest."  Second, Magadia sufficiently alleged that Walmart's § 226(a) violation – depriving him of accurate itemized wage statements – presented a material risk of harm to his interest in the statutorily guaranteed information. The panel also concluded that other class members who could establish § 226(a) injuries had standing to collect damages.

Finally, the panel considered the merits of Magadia's two claims under Cal. Labor Code § 226(a).  First, the panel held that the wage statement law did not require Walmart to list the rate of the MyShare overtime adjustment on employees' wage statements, and the district court erred in holding otherwise.  Because Walmart must retroactively calculate the MyShare overtime adjustment based on work from six prior periods, the panel did not consider it an hourly rate "in effect" during the pay period for purposes of § 226(a)(9), and Walmart complied with the wage statement law here. Second, the panel held that Walmart's Statement of Final Pay did not violate the wage statement statute. Namely, Walmart complied with Cal. Labor Code § 226(a)(6) when it furnished the required pay-period dates to Magadia and other terminated employees in their final wage statements at the end of the next semimonthly pay period.

**COUNSEL**

Theane Evangelis (argued), Julian W. Poon, Bradley J. Hamburger, and Joseph Tartakovsky, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendants-Appellants.

Jonathan E. Taylor (argued), Deepak Gupta, Gregory A. Beck, and Daniel Wilf-Townsend, Gupta Wessler PLLC, Washington, D.C.; Larry W. Lee, Kwanporn Tulyathan, and Max Gavron, Diversity Law Group PC, Los Angeles, California; Dennis S. Hyun, Hyun Legal APC, Los Angeles, California; for Plaintiff-Appellee.

Thomas R. Kaufman, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California, for Amici Curiae Employers Group and California Employment Law Council.

Matthew B. Gunter, Assistant General Counsel, RCN Capital LLC, South Windsor, Connecticut, for Amicus Curiae RCN Capital LLC.

Deanna M. Rice, O'Melveny & Myers LLP, Washington, D.C.; Anton Metlitsky, O'Melveny & Myers LLP, New York, New York; Steven P. Lehotsky and Jonathan D. Urick, U.S. Chamber Litigation Center, Washington, D.C.; Stephanie Martz, National Retail Federation, Washington, D.C.; Deborah R. White, Retail Litigation Center Inc., Arlington, Virginia; for Amici Curiae Chamber of Commerce of the United States of America, National Retail Federation, and Retail Litigation Center Inc.

Henry Hewitt and Sairah Budhwani, Legal Aid at Work, San Francisco, California, for Amicus Curiae Legal Aid at Work.

## OPINION

BUMATAY, Circuit Judge:

Roderick Magadia worked sales for Walmart for eight years.  After the company let him go, Magadia filed a class action suit against Wal-Mart Associates, Inc., and Walmart, Inc., (collectively, "Walmart"), alleging three violations of California Labor Code's wage-statement and meal-break requirements.  First, Magadia alleged that Walmart didn't provide adequate pay rate information on its wage statements.  *See* Cal. Lab. Code § 226(a)(9).  Next, he claimed that Walmart failed to furnish the pay-period dates with his last paycheck.  *See id*. § 226(a)(6).  Finally, he asserted that Walmart didn't pay adequate compensation for missed meal breaks.  *See id*. § 226.7(c).  Magadia sought penalties for these claims under California's Private Attorneys General Act ("PAGA"), which authorizes an aggrieved employee to recover penalties for Labor Code violations on behalf of the government and other employees. *See id.* § 2699.

The district court at first certified classes corresponding to each of Magadia's three claims.  After summary judgment and a bench trial, the district court found that Magadia in fact suffered no meal-break violation and decertified that class. Even so, the district court allowed Magadia to still seek PAGA penalties on that claim based on violations incurred by other Walmart employees.  The district court then ruled against Walmart on the three claims and awarded Magadia and the two remaining classes over $100 million in damages and penalties.

On appeal, we hold that Magadia lacked standing to bring the meal-break claim because he did not suffer injury himself.  As for the two wage-statement claims, we hold that

Magadia had standing but conclude that Walmart did not breach California law.

## I.

Walmart pays its employees and issues wage statements every two weeks. Walmart also voluntarily offers quarterly "MyShare" bonuses to high-performing employees. Walmart reports these quarterly bonuses on qualifying employees' wage statements as "MYSHARE INCT."

Besides the bonus itself, California law requires Walmart to adjust the rate of overtime pay it awards employees to account for these bonuses. *See* Cal. Lab. Code § 510. That's because California considers an employee's bonus to be part of the employee's "regular rate of pay" when calculating overtime rates. *See Alvarado v. Dart Container Corp. of Cal.*, 4 Cal. 5th 542, 554 (2018). Thus, if a Walmart employee receives a MyShare bonus and worked overtime during that quarter, the employee must receive an adjusted overtime pay because of that MyShare bonus. Walmart calculates this adjusted overtime pay using a formula that includes the number of hours the employee worked each pay period of the quarter and the employee's overtime rate.[1] Walmart lists this adjusted overtime pay on its employee's wage statement as "OVERTIME/INCT." Walmart's OVERTIME/INCT item appears as a lump sum on the wage statement issued at the end of the quarter, with no corresponding "hourly rate" or "hours worked."

---

[1] In particular, to calculate the adjusted overtime pay, Walmart adds together all the overtime hours an employee worked over the quarter, prorates the MyShare bonus to account for the total overtime hours worked that quarter, and then adjusts upward the overtime hourly rate for overtime already paid based on the prorated MyShare bonus.

California law separately provides that when "an employer discharges an employee," the employee's wages are due "immediately." Cal. Lab. Code § 201(a). In compliance with the law, Walmart issues a final paycheck at the time of an employee's termination, along with a "Statement of Final Pay." The Statement of Final Pay does not include the "dates of the period for which the employee is paid." *See id*. § 226(a)(6). But Walmart separately provides the employee a final wage statement at the end of the semimonthly pay period that lists the required dates.

California law also requires employers to provide employees "a meal period of not less than 30 minutes" every five hours. *Id.* § 512(a). If employers fail to provide this meal break, they must pay their employees "one additional hour of pay at the employee's regular rate of compensation." *Id.* § 226.7(c). Walmart paid its employees whenever it failed to provide them with a compliant meal break. But when calculating its employees' "regular rate of compensation" for meal-break violations, Walmart relied on the employees' hourly rate and did not factor in the MyShare adjustment to overtime rates.

Magadia worked as a sales associate at Walmart from 2008 to 2016. In late 2016, Walmart fired Magadia and provided him with his final paycheck and a Statement of Final Pay. At the end of his last pay period with the company, Walmart also provided Magadia with his final wage statement. Magadia then filed a putative class action against Walmart in state court, alleging three California Labor Code violations: (1) that Walmart's wage statements violated Labor Code § 226(a)(9) because its adjusted overtime pay does not include hourly rates of pay or hours worked; (2) that Walmart violated § 226(a)(6) by failing to list the pay-period start and end dates in its Statements of

Final Pay; and (3) that Walmart's meal-break payments violated § 226.7 because it did not account for MyShare bonuses when compensating employees. Magadia also sought penalties for all three claims under PAGA. *See* Cal. Lab. Code § 2698 *et seq*. Walmart removed the case to federal court. *See* 28 U.S.C. § 1332(d)(2).

After removal, the district court certified a class for each of Magadia's three claims. The district court later granted Magadia partial summary judgment on his two wage-statement claims and held a three-day bench trial on all three claims. The district court ultimately ruled for Magadia on his two wage-statement claims, holding that Walmart violated both § 226(a)(9) and § 226(a)(6). On the remaining meal-break claim, the district court found that Magadia did not establish that he personally suffered any meal-break violation. The district court held that, since Magadia failed to show that Walmart denied him meal breaks required under California law, his claims were not typical of the claims or defenses of the class. *See* Fed. R. Civ. P. 23(a)(3). As a result, the district court decertified the class based on that claim and denied Magadia's individual claim under § 226.7. Still, the district court permitted Magadia to recover PAGA penalties on the claim because Magadia had established that *other* Walmart employees had sustained meal-break violations.

The district court then awarded Magadia $101,947,700 for the three claims: $96 million award for the adjusted-overtime-rate claim ($48 million in statutory damages and another $48 million in PAGA penalties); $5.8 million in PAGA penalties for the final-wage-statement claim; and $70,000 in PAGA penalties for the meal-break claim.

On appeal, we review findings of fact for clear error and conclusions of law de novo. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011).

## II.

Before we turn to the merits of his claims, we must ensure that Magadia has Article III standing. To meet the "irreducible constitutional minimum" of standing, a plaintiff must have (1) suffered an "injury in fact," (2) that is "fairly traceable" to the challenged conduct, and (3) will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To show an injury in fact, the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be concrete, it "must actually exist." *Id.* Standing must "persist throughout all stages of [the] litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).

## A.

## 1.

We start by considering whether Magadia has standing to bring a PAGA claim for the meal-break violations. Although the district court found that he did not suffer a meal-break injury himself, Magadia insists he has standing to pursue this claim because PAGA is a *qui tam* statute. Of course, with no individualized harm, Magadia cannot establish traditional Article III standing. *See Lujan*, 504 U.S. at 560 & n.1.

But *qui tam* actions are a "well-established exception" to the traditional Article III analysis.  *Spokeo*, 136 S. Ct. at 1552 n.* (Thomas, J., concurring) (simplified); *see Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769 n.1, 774–76 (2000) (discussing *qui tam*'s historical pedigree and concluding that the False Claims Act ("FCA") was a *qui tam* statute).  *Qui tam* is short for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," meaning he "who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency*, 529 U.S. at 768 n.1.  A *qui tam* statute permits private plaintiffs, known as relators, "to sue in the government's name for the violation of a public right." *Spokeo*, 136 S. Ct. at 1552 n.* (Thomas, J., concurring).

*Qui tam* standing for uninjured plaintiffs flows from an assignment theory.  *Vermont Agency*, 529 U.S. at 773–74. The Court has recognized that an "adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773.  In a *qui tam* action, the government partially assigns its claims to the relator, "who then may sue based upon [the government's] injury." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993).  In other words, a "*qui tam* action is for a redress" of the government's injury, and "it is the government's injury that confers standing upon the private person." *Stalley v. Methodist Healthcare*, 517 F.3d 911, 917 (6th Cir. 2008). Thus, the Court has concluded that a non-injured relator has standing when the statute "effect[ed] a partial assignment of the Government's damages claim." *Vermont Agency*, 529 U.S. at 773.

Outside the narrow "exception" of *qui tam* actions, however, the Supreme Court has expressed skepticism that "mere authorization to represent a third party's interests is

sufficient to confer Article III standing on private parties with no injury of their own." *Hollingsworth*, 570 U.S. at 710. After all, States "have no power directly to enlarge or contract federal jurisdiction." *Fiedler v. Clark*, 714 F.2d 77, 80 (9th Cir. 1983) (per curiam) (simplified). Ultimately, "standing in federal court is a question of federal law, not state law." *Hollingsworth*, 570 U.S. at 715.

Though the California Supreme Court has categorized PAGA as "a type of *qui tam* action," *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 360 (2014), we must look beyond the mere label attached to the statute and scrutinize the nature of the claim itself. Historically, common-law courts have required an individualized showing of injury before permitting a private plaintiff to vindicate "public rights"—rights involving duties owed "to the whole community, considered as a community, in its social aggregate capacity." *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring) (quoting 4 William Blackstone, Commentaries *5). And in the modern era, the Court has rejected several attempts by States to bypass the individualized-injury requirement of Article III by authorizing private plaintiffs to represent the States' interests. *See, e.g.*, *Hollingsworth*, 570 U.S. at 707–13.

With that in mind, we examine "historical practice" to determine whether a harm "has traditionally been regarded as a basis for a lawsuit." *Spokeo*, 136 S. Ct. at 1549. A purported *qui tam* statute must hew closely to the traditional scope of a *qui tam* action for an uninjured plaintiff to maintain suit under Article III. *Cf. Vermont Agency*, 529 U.S. at 774 ("[T]he Constitution established that judicial power could come into play only in matters that were the traditional concern of the courts at Westminster[.]" (simplified)). So long as PAGA claims satisfy the traditional

criteria for a *qui tam* action, Magadia may pursue his meal-break claim.

**2.**

On close inspection, PAGA has several features consistent with traditional *qui tam* actions—yet many that are not. Foremost among the similarities, PAGA operates as an assignment from California to a relator-type plaintiff. A PAGA plaintiff serves as a "proxy or agent of the state's labor law enforcements agencies" and represents the "same legal right and interest as state labor law enforcement agencies." *Iskanian*, 59 Cal. 4th at 380 (simplified). As part of that assignment, PAGA authorizes an aggrieved employee to recover a "civil penalty" that could have otherwise been "assessed and collected by" California's Labor & Workforce Development Agency ("LWDA"). Cal. Lab. Code § 2699(a).

Also consistent with traditional *qui tam* actions, PAGA requires private-party plaintiffs to "share a monetary judgment with the government[,] . . . with the government receiving the lion's share." *Methodist Healthcare*, 517 F.3d at 918. The FCA, for example, designates 25% of the judgment to the relator, with the rest remitted to the Federal government. 31 U.S.C. § 3730(d)(1), (2). Similarly, a PAGA plaintiff must give the "lion's share" (75%) of the civil penalties recovered to the LWDA with the remainder distributed among "aggrieved employees." Cal. Lab. Code § 2699(i).

And just like *qui tam* statutes, PAGA permits the government to dictate whether a private plaintiff may bring a claim in the first place. For example, FCA relators must first present the government with their proposed complaint and related materials before they can start an action against

a defendant; at that point the government may consider whether to "intervene and proceed with the action" in the relator's place.     31 U.S.C. § 3730(b)(1)–(3).     If the government elects to intervene, it will "take over the action," and the prosecution of the case will "be conducted by the Government," not the would-be plaintiff.  *Id.* § 3730(b)(4). Likewise, a putative PAGA plaintiff must give written notice of the alleged Labor Code violation to the LWDA before suing.  *See* Cal. Lab. Code § 2699.3(a).  A PAGA suit can begin only after the LWDA provides notice that "it does not intend to investigate the alleged violation" in the plaintiff's notice or if the LWDA doesn't respond within 65 days.  Cal. Lab. Code § 2699.3(a)(2)(A).  But if, after investigating the violation, the LWDA decides to issue a citation to the employer, "the employee may not commence" a civil action under PAGA.  *Id.* § 2699.3(b)(2)(A)(i).

Despite these similarities, however, PAGA differs in significant respects from traditional *qui tam* statutes.  First, PAGA explicitly involves the interests of others besides California and the plaintiff employee—it also implicates the interests of nonparty aggrieved employees.  By its text, PAGA authorizes an "aggrieved employee" to bring a civil action "on behalf of himself or herself and *other current or former employees*."  Cal. Lab. Code § 2699(a) (emphasis added).[2]  And PAGA requires that "a portion of the penalty goes not only to the citizen bringing the suit but *to all employees affected* by the Labor Code violation."  *Iskanian*, 59 Cal. 4th at 382 (emphasis added); *see* Cal Lab. Code

---

[2] By contrast, an FCA relator must sue in the name of the United States, *see* 31 U.S.C. § 3730(b)(1), which designates that the government is *the* real party in interest, *Methodist Healthcare*, 517 F.3d at 918.

§ 2699(i).**[3]**    Finally, a judgment under PAGA binds California, the plaintiff, *and* the nonparty employees from seeking additional penalties under the statute.  *Iskanian*, 59 Cal. 4th at 381.**[4]**  PAGA therefore creates an interest in penalties, not only for California and the plaintiff employee, but for nonparty employees as well.

This feature is atypical (if not wholly unique) for *qui tam* statutes.**[5]**  It conflicts with *qui tam*'s underlying assignment theory—that the real interest is the government's, which the government assigns to a private citizen to prosecute on its behalf.  *Cf. Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 522 (8th Cir. 2007) ("A 'private' right is different from

---

**[3]** *See also Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 852 n.3 (9th Cir. 2020) (PAGA's monetary judgment "is not awarded exclusively to the employee who files the suit" but is rather "allocated among the aggrieved employees."); *Williams v. Superior Court*, 3 Cal. 5th 531, 545 (2017) (PAGA "deputiz[es] employees harmed by labor violations to sue on behalf of the state and collect penalties, to be shared with the state and other affected employees."); *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009) ("[T]here remain situations in which nonparty aggrieved employees may profit from a judgment in an action brought under [PAGA].").

**[4]** The PAGA action, however, does not prevent nonparty aggrieved employees from seeking "other remedies under state or federal law." *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014).

**[5]** For example, none of the other modern *qui tam* statutes mentioned in *Vermont Agency* authorize suits on behalf of non-parties or involve payments to non-parties. *See* 529 U.S. at 769 n.1 (citing 25 U.S.C. § 81, 26 U.S.C. § 201, 35 U.S.C. § 292(b)); *see also* Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296–97 & n. 105–06 (1989) (listing early American *qui tam* statutes, which limited recovery to the relator and the government).

a public right and *qui tam* cases exist to vindicate public rights." (simplified)).  And it conflicts with Article III's core principle that each plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Indeed, California courts have themselves recognized that PAGA's peculiar feature makes it an "except[ion]" to the "traditional criteria" of *qui tam* actions. *Iskanian*, 59 Cal. 4th at 382; *see also Moorer v. Noble L.A. Events, Inc.*, 32 Cal. App. 5th 736, 742 (2019) (rejecting plaintiff's argument that, since PAGA is a type of *qui tam* action, the entire 25% of the civil penalties not allocated to the government should go to the aggrieved employee who brings the PAGA suit).  While California may be *a* "real party in interest," *Iskanian*, 59 Cal. 4th at 387, a PAGA suit also implicates the interests of other third parties.

Second, a traditional *qui tam* action acts only as "a *partial* assignment" of the Government's claim.  *Vermont Agency*, 529 U.S. at 773 (emphasis added).  The government remains the real party in interest throughout the litigation and "may take complete control of the case if it wishes." *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994).  Under the FCA, for instance, the federal government can intervene in a suit, can settle over the objections of the relator, and must give its consent before a relator can have the case dismissed.  31 U.S.C.  § 3730(b)–(f).    These "significant procedural controls" ensure that the government maintains "substantial authority over the action."  *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc*., 524 F.3d 1229, 1234 (11th Cir. 2008).  So even if the government partially assigns a claim to a relator, "it retains a significant role in the way the action is conducted."  *Methodist Healthcare*, 517 F.3d at 918.

In contrast, PAGA represents a permanent, *full* assignment of California's interest to the aggrieved employee. True enough, PAGA gives California the right of first refusal in a PAGA action. An aggrieved employee can only sue if California declines to investigate or penalize an alleged violation; and California's issuance of a citation precludes any employees from bringing a PAGA action for the same violation. Cal. Lab. Code §§ 2699(h), 2699.3(b)(2)(A)(i). But once California elects not to issue a citation, the State has no authority under PAGA to intervene in a case brought by an aggrieved employee. *See Iskanian*, 59 Cal. 4th at 389–90 (acknowledging that PAGA "authoriz[es] financially interested private citizens to prosecute claims on the state's behalf without governmental supervision"). PAGA thus lacks the "procedural controls" necessary to ensure that California—not the aggrieved employee (the named party in PAGA suits)—retains "substantial authority" over the case. *See Orlando Reg'l Healthcare*, 524 F.3d at 1234.

Consistent with a *full* assignment, an aggrieved employee's PAGA judgment precludes California from citing the employer for the same violation. *See Iskanian*, 59 Cal. 4th at 381. In that way, PAGA prevents California from intervening in a suit brought by the aggrieved employee, yet still binds the State to whatever judgment results. A complete assignment to this degree—an anomaly among modern *qui tam* statutes—undermines the notion that the aggrieved employee is solely stepping into the shoes of the State rather than also vindicating the interests of other aggrieved employees.

### 3.

Our precedent also shows the lack of standing here. We have ruled that an uninjured party has no Article III standing

to sue under another California private attorney general statute involving unfair business practices. *See Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1002 (9th Cir. 2001) (citing Cal. Bus. & Prof. Code § 17204). In *Lee*, we held that the statute did not confer standing on a party who had not "actually been injured by the defendant's challenged conduct," even though the law permitted any person to sue on behalf of California. *Id.* at 1001–02; *see also Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1022 (9th Cir. 2004) ("Even if Cal. Bus. & Prof. Code § 17204 permits a plaintiff to pursue injunctive relief in California state courts as a private attorney general even though he or she currently suffers no individualized injury as a result of a defendant's conduct," the plaintiff must show the requisite injury to establish Article III standing.); *Fiedler*, 714 F.2d at 79–80 (rejecting Article III standing when uninjured plaintiff claimed to be "suing as a private Attorney General on behalf of citizens of Hawaii rather than as a private citizen").[6]

Several circuit courts have likewise concluded that comparable statutes are not *qui tam* for purposes of Article III, based on the same features we identify in PAGA. *See, e.g.*, *Orlando Reg'l Healthcare*, 524 F.3d at 1233–34 (holding that the Medicare Secondary Payer Act "differs

---

[6] Although we have acknowledged that PAGA is a "type" or "form" of *qui tam*, we have never decided whether it confers Article III standing on uninjured employees. *See, e.g.*, *Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1061 (9th Cir. 2017) (holding that PAGA is a "type of *qui tam*" for purposes of an automatic stay in bankruptcy); *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 439 (9th Cir. 2015) (holding that the Federal Arbitration Act did not preempt PAGA because it is a "form of *qui tam*" action); *Baumann*, 747 F.3d at 1124 (holding that PAGA is not a class action but "a civil enforcement action filed on behalf of and for the benefit of the state").

materially" from a *qui tam* action partly because it "provides to the government none of the procedural safeguards to manage or direct an action" traditionally afforded); *Methodist Healthcare*, 517 F.3d at 918 (same); *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 24 (1st Cir. 2007) (same); *Woods*, 574 F.3d at 97–98 (same); *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494–95 (6th Cir. 2019) (holding that a "private attorneys general" suit is not necessarily "entitled to special solicitude in an Article III standing analysis").

\*\*\*

Altogether, PAGA's features diverge from *Vermont Agency*'s assignment theory of *qui tam* injury, and they depart from the traditional criteria of *qui tam* statutes. As a result, we hold that Magadia lacks standing to bring a PAGA claim for Walmart's meal-break violations since he himself did not suffer injury.[7] We remand Magadia's meal-break claim to the district court with instructions to return it to state court. *See Lee*, 260 F.3d at 1008.

**B.**

Next, we consider whether Magadia has standing to bring his two wage-statement claims under Labor Code § 226(a). That provision requires employers to accurately furnish certain itemized information on its employees' wage statements. Cal. Lab. Code § 226(a). Walmart disputes that a violation of § 226(a) creates a cognizable Article III injury here. We hold that it does.

---

[7] Because Magadia doesn't having standing to bring a PAGA action on behalf of employees who personally suffered a meal-break injury, we do not decide whether Walmart violated § 226.7(c).

The hallmark of an Article III injury is that it is concrete and particularized. Although we often think of "tangible" injuries as the basis of this jurisdictional requirement, the Supreme Court has confirmed that "intangible injuries can nevertheless be concrete." *Spokeo*, 136 S. Ct. at 1549. The omission of statutorily required information can constitute a distinct, concrete injury.**[8]** At the same time, not "every minor inaccuracy reported in violation of [a statute] will 'cause real harm or present any material risk of real harm.'" *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1116 (9th Cir. 2017) ("*Spokeo II*") (quoting *Spokeo*, 136 S. Ct. at 1550) (simplified).

To determine whether the violation of a statute constitutes a concrete harm, we engage in a two-part inquiry. We first consider "whether the statutory provisions at issue were established to protect . . . concrete interests (as opposed to purely procedural rights)." *Id.* at 1113. If so, we then assess "whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Id.*

First, we believe § 226(a) protects employees' concrete interest in receiving accurate information about their wages in their pay statements. An employer violates the statute if it "fails to provide accurate and complete information"

---

**[8]** *See FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."); *Envt'l Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) ("The law is settled that a denial of access to information qualifies as an injury in fact" when disclosure of that information is required by statute.); *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1102–05 (9th Cir. 2016) (holding that informational injuries under FOIA satisfy Article III's "injury-in-fact" requirement).

required by § 226(a), and if "the employee cannot promptly and easily determine [that information] from the wage statement alone." Cal. Lab. Code § 226(e)(2)(B). Section 226(a)'s procedural guarantees therefore protect an employee's non-abstract interest in being "adequately informed of [the] compensation received" during the pay period. *Soto v. Motel 6 Operating, L.P.*, 4 Cal. App. 5th 385, 392 (2016) (simplified). As a result, Walmart's failure to disclose statutorily required information on Magadia's wage documents, if true, violates a "concrete interest." *Spokeo II*, 67 F.3d at 1113 (simplified).

Second, Magadia sufficiently alleges that Walmart's § 226(a) violations—depriving him of accurate itemized wage statements—presented a "material risk of harm" to his "interest" in the statutorily guaranteed information. *See Spokeo II*, 867 F.3d at 1113. Even when a statute "has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest." *Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016). That is because a "procedural violation of an informational entitlement does not by itself suffice to keep a claim in federal court." *Brintley*, 936 F.3d at 493. The plaintiff must further "allege at least that the information had some relevance to *her*." *Id.*

While Walmart claims that Magadia was not harmed because it did not underpay him, the lack of the required information runs the risk of leaving him and other employees unable to determine whether that is true. As Walmart's own witnesses confirmed, without the mandated information, employees could not tell from their wage statements how the company calculated their wages or which dates the paystub covered—precisely the sort of "real harm[]" that § 226(a) is

"designed to prevent." *See Spokeo II*, 867 F.3d at 1115; Cal. Lab. Code § 226(e)(2)(B). Even if Walmart pays its employees every penny owed, those employees suffer a real risk of harm if they cannot access the information required by § 226(a). *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016) ("[I]nformational injury need not result in direct pecuniary loss.").[9]

We therefore hold that Magadia has standing to bring his two claims under Labor Code § 226(a). For the same reason, we also conclude that other class members who can establish § 226(a) injuries have standing to collect damages. *See Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1017 (9th Cir. 2020) (holding that all class members "must satisfy the requirements of Article III standing at the final stage of a money damages suit when class members are to be awarded individual monetary damages").

## III.

We turn, finally, to the merits of Magadia's two claims under California's wage statement statute. Cal. Lab. Code § 226(a). To recover damages under the law, Magadia must prove that he "suffer[ed] injury as a result of a knowing and intentional failure by an employer to comply with the

---

[9] Walmart alternatively argues that California, unlike Congress, cannot confer Article III standing based on a procedural violation. Again, we disagree. A legislature "has the power to create new interests, the invasion of which may confer standing" so long as "the requirements of Art. III [are] met." *Diamond v. Charles*, 476 U.S. 54, 66 n.17 (1986). Walmart seeks to distinguish between injuries born of state law and those born of federal law. But we have held that "state law can create interests that support standing in federal courts." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001)).

statute." *Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142 (2011) (citing Cal. Lab. Code § 226(a), (e)).    The district court determined that Magadia proved that Walmart violated the statute.  We disagree.

**A.**

First, we conclude that the wage statement law did not require Walmart to list the "rate" of the MyShare overtime adjustment on employees' wage statements.    The law requires an itemized statement with "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee."  Cal. Lab. Code § 226(a)(9).  The district court held that the wage statements didn't comply with the law because they didn't include the "hourly rates" and "hours worked" associated with the MyShare overtime adjustment. This was error.

Walmart did not violate the wage statement law because there was no "hourly rate[] in effect during the pay period" for the MyShare overtime adjustment.  Walmart paid its employees every two weeks and provided a paystub at the end of each semimonthly pay period.  At the end of a quarter (encompassing six pay periods), Walmart awarded a MyShare bonus to its employees based on performance, sales, profits, and store standards *from the entire quarter*. California law considers that bonus part of the employees' base rate of pay, which in turn requires Walmart to make an after-the-fact adjustment to overtime pay.  *See* Cal. Lab. Code § 510 (requiring employers to pay 1.5 times the "regular rate of pay" for overtime).  To do so, Walmart must retroactively calculate the difference between the employees' overtime pay rate over the quarter and the employees' overtime rate as if the MyShare bonus had been paid as part of the base rate of pay.  After calculating the

required overtime pay adjustment, Walmart reported both the MyShare bonus and the adjusted overtime pay as lump sums on the wage statements at the end of each quarter.

Under these facts, the MyShare overtime adjustment is no ordinary overtime pay with a corresponding hourly rate. It is a non-discretionary, after-the-fact adjustment to compensation based on the overtime hours worked and the average of overtime rates[10] over a quarter (or six pay periods). As a recent California court recognized with a similar bonus scheme, the supposed "hourly rate" for the adjusted overtime pay "is a fictional hourly rate calculated after the pay period closes in order to comply with the Labor Code section on overtime"—"[i]t appears as part of the calculation for an overtime bonus and then disappears, perhaps never to be seen again." *Morales v. Bridgestone Retail Operations, LLC*, No. G057043, 2020 WL 1164120, at *1 (Cal. Ct. App. Mar. 11, 2020) (unpublished); *see also Canales v. Wells Fargo Bank, N.A.*, 23 Cal. App. 5th 1262 (2018) (unpublished)[11] (Because "[t]he OverTimePay Override was an adjustment to the overtime payment due to an employee, based on bonuses earned by the employee for work performed during prior pay period . . . there were no

---

[10] Since an employee's overtime pay rate may fluctuate throughout a quarter, Walmart needed to consider the average overtime rate in calculating the overtime adjustment. That Walmart must base the overtime adjustment on an *average* of overtime rates from the quarter is more evidence that the adjustment is not an "hourly rate[] in effect during the pay period."

[11] Available at: https://caselaw.findlaw.com/ca-court-of-appeal/1896937.html.

applicable hourly rates in effect during the pay period which defendant was required to include in the wage statement.").**[12]**

As a result, we do not consider the calculation to be an "hourly rate in effect during the pay period." Cal. Lab. Code § 226(a)(9). The term "in effect" is defined as "[t]he state or fact of being operative or in force."**[13]** And the word "during" means "[t]hroughout the whole continuance of," or "in the time of."**[14]** So to be "in effect during the pay period," the hourly rate must have been "operative" or "in force" "throughout the whole continuance of" or "in the time of" the pay period in the wage statement. It does not apply to an artificial, after-the-fact rate calculated based on overtime hours and rates from preceding pay periods that did not even exist during the time of the pay period covered by the wage statement. *See Morales*, 2020 WL 1164120, at *5 ("The hourly rate for the overtime premium is not in effect during the pay period."); *Canales*, 23 Cal. App. 5th 1262 (same).

This reading is confirmed by § 226(a)(9)'s second requirement: that the employer must list the "corresponding number of hours worked at each hourly rate." During the last two-week pay period of the quarter, but before Walmart generates the MyShare bonus, an employee works under his or her ordinary overtime hourly rate, which must be reported

---

**[12]** Although these decisions are unpublished with no precedential value, we may still consider them to interpret California law. *See Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

**[13]** *In Effect*, Oxford English Dictionary Online, tinyurl.com/4f6t8ppt.

**[14]** *During*, Oxford English Dictionary Online, tinyurl.com/tw6mvf3s.

in the employee's paystub.  At the end of the quarter, if the employee receives a MyShare bonus and its required overtime adjustment, then Walmart must also calculate the overtime adjustment rate.   But at no time during the preceding two-week pay period did the employee work under that overtime rate because it's calculated *after* the close of the pay period based on the *preceding six pay periods* of work.   For example, Magadia's overtime adjustment "rate" was apparently about $.20 per hour.  Yet there was no pay period in which Magadia ever worked overtime at an hourly rate of $.20.   As this illustrates, Magadia's reading of the statute would lead to the anomalous result of having a wage statement listing an "hourly rate" but with zero "number of hours worked" at that rate.

In sum, because Walmart must retroactively calculate the MyShare overtime adjustment based on work from six prior periods, we do not consider it an hourly rate "in effect" during the pay period for purposes of § 226(a)(9).  Walmart complied with the wage statement law here.

## B.

Next, we hold that Walmart's Statements of Final Pay do not violate the wage statement statute.   The law requires employers to furnish employees "semimonthly *or* at the time of each payment of wages" with "an accurate itemized statement in writing showing . . . the inclusive dates of the period for which the employee is paid."   Cal. Lab. Code § 226(a)(6) (emphasis added). Section 226(a)(6)'s use of the disjunctive affords employers the option of furnishing the pay statement *either* semimonthly *or* at the time of each wage payment.  Employers are thus authorized to issue a pay statement at either time of their choosing.  *See Canales*, 23 Cal. App. 5th at 1271–72 (published) ("The plain

meaning of the statute indicates the Legislature specifically intended a choice for employers as to when to furnish the wage statement."). So long as "an employer furnishes an employee's wage statement before or by the semimonthly deadline, the employer is in compliance" with § 226(a)(6). *Id.* at 1271. Walmart complied with this provision.

Magadia insists that Walmart violated the law by not including the "dates of the period for which the employee is paid" on his Statement of Final Pay, which he received along with his final paycheck when he was terminated in the middle of a pay period. But Walmart furnished the required pay-period dates to Magadia and other terminated employees in their final wage statements at the end of the next semimonthly pay period. By the plain meaning of the statute, Walmart had the option of furnishing the required wage statement in this way and thus Walmart complied with the law.[15]

## IV.

For these reasons, we **VACATE** the district court's judgment and award of damages on the Labor Code § 226.7 claim and **REMAND** with instructions to further remand it to state court. We also **REVERSE** the judgment and award of damages on the Labor Code § 226(a) claims and **REMAND** with instructions to enter judgment for Walmart.

---

[15] Since we conclude that Walmart didn't violate § 226(a), we do not decide whether Magadia satisfied the other elements of his claim. We likewise do not decide whether the district court awarded excessive penalties under PAGA.