Filed 5/9/23 (unmodified opn. attached)
Order modifying opinion filed 4/13/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KELLY GOLA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>UNIVERSITY OF SAN FRANCISCO,<br><br>    Defendant and Appellant. | A161477<br><br>(San Francisco County<br> Super. Ct. No. CGC-18-565018) |
| KELLY GOLA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>UNIVERSITY OF SAN FRANCISCO,<br><br>    Defendant and Appellant. | A162437<br><br>(San Francisco County<br> Super. Ct. No. CGC-18-565018)<br>**ORDER MODIFYING CONCURRING<br>AND DISSENTING OPINION** |

BY THE COURT:

It is ordered that the opinion filed herein on April 13, 2023, be modified as follows:

On the fourth line of the first full paragraph on page four of the concurring and dissenting opinion, the first word "rights" should be changed to "right".

This modification does not change the judgment.

Dated:_____          _____

                                                            Stewart, P.J.

1

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Curtis Karnow |
| Attorneys for Plaintiff and Appellant: | Goldstein, Borgen, Dardarian & Ho<br>Morris J. Baller |
| | Katz, Marshall & Banks, LLP<br>Daniel B. Edelman<br>*Pro Hac Vice* |
| | Hammondlaw, P.C.<br>Julian Hammond<br>Polina Brandler<br>Ari Cherniak<br>Arie Michelsohn<br>*Pro Hac Vice* |
| Attorneys for Defendant And Respondent: | Vartain Law Group, P.C.<br>Michael J. Vartain<br>Ross J. Vartain |

Filed 4/13/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KELLY GOLA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>UNIVERSITY OF SAN FRANCISCO,<br><br>     Defendant and Appellant. | A161477<br><br>(San Francisco County<br> Super. Ct. No. CGC-18-565018) |
| KELLY GOLA,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>UNIVERSITY OF SAN FRANCISCO,<br><br>     Defendant and Appellant. | A162437<br><br>(San Francisco County<br> Super. Ct. No. CGC-18-565018) |

Kelly Gola and members of the class she represents were adjunct faculty—part-time university professors engaged to teach on a semester-by-semester basis—at the University of San Francisco (the University). This consolidated appeal arises from Gola's lawsuit challenging aspects of the University's employment practices as violating California law.

The University appeals the trial court's judgment, after a bench trial, awarding Gola penalties and attorneys' fees in connection with the University's failure to issue wage statements compliant with Labor Code

1

section 226, subdivision (a) (section 226(a)).[1] We reject the University's argument that newly enacted Labor Code section 515.7—permitting employers to classify certain adjunct faculty as exempt from specified wage statement requirements—should be applied retroactively to the wage statements at issue here. We also reject the University's arguments that the trial court erred in finding it liable for section 226 violations.

Gola cross-appeals the trial court's dismissal of her claims for unpaid wages and waiting-time penalties as preempted by federal law. The federal Labor Management Relations Act (LMRA) (29 U.S.C. § 141 et seq.) preempts state courts from adjudicating claims requiring them to interpret or construe collective bargaining agreements (CBAs). Because we conclude that Gola's claims cannot be resolved without interpreting the CBA between the University and the labor organization of its adjunct faculty, we agree with the trial court's determination that federal law preempts Gola's claims. We affirm the judgment.

## BACKGROUND

During the period relevant here, the University's practice with respect to adjunct faculty was to hire them to teach individual classes on a semester-by-semester basis. For each semester, the University would issue appointment letters offering employment to prospective adjunct professors during a specified assignment period that ran from the first day of that semester's classes to the end of the semester. The appointment letters stated that the employment terms were "consistent with the terms of the Collective Bargaining Agreement" between the University and its adjunct faculty union and with University policies applicable to the teaching assignment. The

---

[1] Subsequent statutory references are to the Labor Code except as otherwise indicated.

2

letters provided a link to the CBA. They also specified a per-course salary, the number of credit units for the course, and an estimate of the number of hours the adjunct would work per week (which, trial evidence showed, was roughly 2.25 hours per credit unit).

Although the appointment letters specified the first day of classes each semester as the beginning of the adjunct's work appointment and the end of the semester as the end of the appointment, adjunct professors were required to work outside of these time periods: they were expected to prepare a syllabus and final examination for the class before the start date of classes, and they were obliged to submit students' final grades after classes and final exams concluded. These obligations were set out in the CBA and in a "Part-Time Faculty Policy Handbook."

The appointment letters specified that adjuncts' salary would be paid in installments, typically four per semester, in accordance with the University's payroll schedule. Adjuncts received paystubs or wage statements with their pay. The wage statements reflected the amount of pay they received but did not show the number of hours they worked or an hourly rate of pay. Adjuncts were not asked to track the number of hours they worked. This had been the practice at the University for decades before Gola's lawsuit.

Adjunct faculty at the University, of whom there are more than 600, are represented by a labor organization: the "USF Part Time Faculty Association" (Association). The Association and the University have entered into a series of CBAs over the years governing the terms of adjunct faculty employment. For the time period covered by Gola's lawsuit, two CBAs were in effect: one that took effect July 1, 2015, and another that is dated July 1, 2018, and was finally executed on August 2, 2019. Both of those CBAs set out a salary schedule for adjunct faculty; both require adjuncts to submit

3

syllabi before classes begin and to submit final grades "in a reasonable and timely manner"; and both state that the parties agree that the "terms of this Agreement (including pay for Association members) compl[y] with all federal, state and local wage laws." The July 1, 2018 CBA added that the parties agreed "the classification of bargaining unit faculty are as professional employees."

Gola filed a lawsuit against the University on March 15, 2018 and filed the operative complaint on July 19, 2018. As a first cause of action, the operative complaint alleged a claim for unpaid wages on behalf of Gola and a class of similarly situated adjuncts pursuant to sections 1194 and 1194.2. According to this claim, the assignment letters set out the terms of an employment contract only for the period specified in the letters, i.e., the teaching semester, and set a salary for that period only. Yet adjunct faculty were required to work outside that period to prepare syllabi and course materials before classes started, and to grade exams and submit final grades after classes ended, and they were not paid for their time outside the assignment period. The same factual basis underlay the complaint's third cause of action, failure to pay compensation at the time of discharge in violation of sections 201 through 203. Here, Gola and a similarly situated subclass contended that, because the University did not pay them for work outside of the assignment period, it also did not pay them all wages due on termination and was therefore liable for statutory waiting-time penalties.

As a second cause of action, the operative complaint alleged that the University failed to issue wage statements in compliance with section 226(a) because adjuncts' wage statements did not include the total hours worked during the pay period and the effective hourly rate.

4

Gola's operative complaint asserted two additional claims:  as a fourth cause of action, she alleged violations of the Unfair Competition Law.  (Bus. & Prof. Code, § 17200 et seq.)  The trial court held after a bench trial that this claim was abandoned, and Gola does not appeal that determination, so we do not discuss it further.  Finally, Gola asserted a derivative claim under the Private Attorneys General Act (PAGA) (§ 2698 et seq.) seeking civil penalties for the Labor Code violations asserted in counts one through three.

As an affirmative defense, the University asserted that Gola's claims were preempted by the LMRA, which preempts all state-law claims that require interpretation of a CBA.  This affirmative defense was bifurcated and tried to the court.  Following the bench trial, the trial court issued a statement of decision holding that Gola's first and third causes of action were indeed preempted because these claims could not be resolved without interpreting the CBA.

With respect to Gola's second cause of action, the wage statement claim, the trial court determined this claim was not preempted by federal law.  The wage statement claim proceeded to a bench trial on the merits, after which the trial court issued a second statement of decision.  The factual findings in this statement of decision are not disputed on appeal.  In brief, the trial court found that the wage statements the University issued to adjunct faculty did not include the "total hours worked by the employee" or the employee's effective hourly rate.  The court concluded that adjunct faculty were not exempt employees; in fact, the University made no argument at trial to the contrary.  Instead, the University argued that it could not be liable for penalties because its section 226 violation was not knowing and voluntary.  The trial court rejected this argument, finding that the University was liable for penalties because it knew that facts existed bringing its actions or

omissions within the provisions of section 226.  The trial court found as a factual matter that "the evidence is not that the University had a good faith belief [that instructors were exempt under state law]; the evidence is that they never thought about it."  The trial court also rejected the University's statutory defense that requiring it to list the hours adjunct faculty worked on their wage statements would be misleading and contrary to the purposes of section 226 because adjunct faculty were paid by the course, not by the hour, and the University did not track the number of hours adjuncts worked.

Having found the University liable for section 226 violations, the trial court calculated statutory damages of $1,621,600 and PAGA penalties of $545,235.  The trial court issued its judgment on August 20, 2020.  The University timely appealed the judgment, and Gola cross-appealed.  The trial court later issued an order awarding Gola $1,307,225.95 in attorneys' fees and $21,510.23 in costs, and subsequently issued an amended judgment nunc pro tunc reflecting the award of fees and costs to Gola.  The University timely appealed the amended judgment, and we consolidated the appeals.

## DISCUSSION

### I.  Wage Statement Claim

### A. General Principles

" 'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact.  [Citation.]  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.'  (*Thompson v. Asimos* (2016) 6

6

Cal.App.5th 970, 981.)" (*Furry v. East Bay Publishing, LLC* (2018) 30 Cal.App.5th 1072, 1078 (*Furry*).)

As relevant here, section 226(a) requires an employer to provide a wage statement to its employees upon payment of wages. A wage statement means "an accurate itemized statement in writing showing" specified information about the employee's work and pay, including "total hours worked by the employee" (*id.*, subd. (a)(2)) and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee" (*id.*, subd. (a)(9)). Section 226, subdivision (e) (section 226(e)) provides that an employee who does not receive a compliant wage statement "as a result of a knowing and intentional failure by an employer" to comply with the wage statement requirements is injured and can recover statutory penalties along with other remedies. Section 226, subdivision (e)(3) elaborates that "a 'knowing and intentional failure' does not include an isolated and unintentional payroll error due to a clerical or inadvertent mistake" and that the factfinder may consider an employer's prior compliance with section 226 in deciding whether there has been a knowing and intentional failure. Finally, section 226, subdivision (j)(1) provides that a wage statement need not show total hours worked by the employee if "the employee's compensation is solely based on salary *and* the employee is exempt from payment of overtime" under applicable Labor Code provisions or orders of the Industrial Welfare Commission (IWC). (Italics added.)

At the time of trial, and at the time the University issued the challenged wage statements to Gola and the subclass, there was no Labor Code provision or order of the IWC providing that adjunct faculty were exempt from payment of overtime. Accordingly, pursuant to section 226, subdivision (j)(1), the University was required to issue pay statements

7

showing adjuncts' total hours worked. After the trial court issued its statements of decision and judgment, however, the Legislature enacted section 515.7, which provides that faculty at nonprofit higher education institutions "shall be exempt" from the provisions of section 226, subdivision (a)(2) and (9), provided they are employed in a professional capacity as defined in the statute, and provided they are paid a salary that meets at least one of three tests for minimum compensation (salary tests). (§ 515.7, subd. (a).) The three tests are as follows: (1) a "monthly salary equivalent to no less than two times the state minimum wage for employment in which the employee is employed for at least 40 hours per week" (*id.*, subd. (a)(2)(A)); (2) a salary of at least $117 per classroom hour in 2020, $126 per classroom hour in 2021, $135 per classroom hour in 2022, and for subsequent years, an increase that is proportionate to the increase in the state minimum wage for that year (*id.*, subds. (a)(2)(B) & (b)(1)); and (3) "[w]hen employed under a collective bargaining agreement, payment pursuant to that collective bargaining agreement, if the classification of employment in a professional capacity is expressly included in the collective bargaining agreement in clear and unambiguous terms" (*id.*, subd. (a)(2)(C)). Introduced as Assembly Bill No. 736 (2019–2020 Reg. Sess.), this legislation was finally enacted September 9, 2020, and took effect the same day.

### B. Section 515.7 is Not Retroactive

On appeal, the University does not contend that Gola and the section 226 subclass were exempt employees at the time it issued the challenged wage statements, nor does it contest the trial court's factual finding that the challenged wage statements failed to include hours worked and effective hourly rate. Rather, the University contends that newly enacted section 515.7 should be applied retroactively to this case. If it is so applied, the

8

University contends, Gola's section 226 claims must fail because Gola and the subclass will be classified as exempt for the relevant period: from July 1, 2018, through trial, the University argues that the CBA stated unambiguously that "the classification of bargaining unit faculty are as professional employees" and thus, any compensation pursuant to the CBA meets the third of the statute's three salary tests, set out in section 515.7, subdivision (2)(C), for that time period.[2] And for the entire period of time covered by the trial court's judgment, January 30, 2017, through December 31, 2019, the University argues that it will be able to demonstrate on remand that adjunct faculty received pay that exceeded the second of the statute's salary tests (§ 515.7, subd. (a)(2)(B)).[3]

Gola contends that this argument is not properly before us: the University, she contends, forfeited at trial any argument that adjunct faculty are exempt and accordingly cannot now make the argument. Because section 515.7 was enacted after the trial and judgment, the University could not have relied on it in the trial court. And in any event, we would exercise our discretion to reach this question of law. (See, e.g., *City of Clovis v. County of Fresno* (2014) 222 Cal.App.4th 1469, 1477 ["The rule of forfeiture does not

---

[2] The second CBA, providing that faculty are classified as professional employees, states on its cover page that its effective date is July 1, 2018, but its preamble states that it is "entered into on 26 April 2019," and it was not executed until August 2, 2019. Because we ultimately conclude that section 515.7 does not apply to wage statements issued before the statute's effective date of September 9, 2020, we need not determine the effective date of the CBA's classification of adjuncts as professional employees.

[3] As we discuss further below, the third salary test prescribes minimum salary benchmarks for 2020 and subsequent years but does not expressly include a benchmark for 2019 or prior years. The University does not specify what salary benchmark it would ask the trial court to apply to wage statements issued prior to 2020.

9

apply . . . to 'noncurable defects of substance where the question is one of law' "].)

We turn now to the University's argument. To evaluate it, we must address the effect of section 515.7 as of its effective date of September 9, 2020: when it says that a university instructor "shall be classified" as a professional employee and "shall be exempt" from specified wage statement requirements, does that exemption extend to wage statements issued before the effective date of the statute? Or did the Legislature intend the exemption to apply only to wage statements issued after the statute's effective date? The statute does not directly specify, but we conclude that the better reading of section 515.7 is that it operates prospectively and exempts only wage statements issued after September 9, 2020.

## 1.

" 'A retrospective law is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute.' " (*Aetna Casualty & Surety Co. v. Industrial Accident Commission* (1947) 30 Cal.2d 388, 391.) Whether a statute operates retroactively "is, in the first instance, a policy question for the legislative body" and if it has spoken clearly then no further interpretation is required. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206.) But if judicial construction is required, we begin with the " 'established canon of interpretation that statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent.' " (*Id.* at p. 1207, quoting *Aetna,* at p. 393; see also *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475 [" '[A] statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature

10

intended retroactive application' "]; *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 ["A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so"].)  The Labor Code in particular contains a general statutory provision that counsels against retroactive application of its sections.  (§ 4; see also *Evangelatos*, at pp. 1207–1208 [identifying section 4 as a provision "reflect[ing] the common understanding that legislative provisions are presumed to operate prospectively"].)  Our Supreme Court has also said that "statutes that affect an employee's substantive rights are construed to operate prospectively" absent an express contrary intent. (*Hoffman v. Board of Retirement* (1986) 42 Cal.3d 590, 593.)

Section 515.7 is plainly intended to create a pathway to accord adjunct faculty exempt professional status and relieve nonprofit universities of hour and pay reporting requirements for adjuncts, provided adjuncts' pay meets one of the three salary tests.  But the statute does not directly speak to whether it reaches back to hour and pay reporting obligations incurred before September 9, 2020.  This silence in itself strongly indicates prospective application.  Moreover, we find in the text of the statute itself an additional indication of prospective application:  the second of the three salary tests set out in the statute only applies by its terms to 2020 and all subsequent years. (§ 515.7, subd. (b)(1).)  That the Legislature did not set out a benchmark for minimum salary for 2019 or prior years before the statute's enactment suggests that it did not see a need for one because it did not intend those applications.  And the Legislature's use of the phrases "shall be classified" and "shall be exempt" provides a further, albeit modest, suggestion of prospective application.  (See *San Francisco Sav. Union v. Reclamation Dist. No. 124* (1904) 144 Cal. 639, 647 [statutory language that a water

reclamation district " 'shall be deemed organized and shall have power to sue and be sued' " "would seem to be intended to have a prospective operation only"]; *Russell v. Superior Court* (1986) 185 Cal.App.3d 810, 818–819 ["The phrase 'shall be,' to the commonsensical mind, connotes the future and implies the application of the subject under discussion to future events. The use of 'shall be' has been held to connote a legislative intent to apply a statutory amendment prospectively only"]; *Seale v. Balsdon* (1921) 51 Cal.App. 677, 681 [" ' "shall be" represents what will take place in future time. If the Legislature had intended to make the law retroactive, it would have been easy to express it by the use of the words *has been* or *had been*, in the present or past perfect tense, or other equivalent words' "].)

The University does not claim that the statute contains an express retroactivity provision, and it acknowledges the presumption against retroactivity. But the University argues that the legislative history and remedial purposes of section 515.7 overcome the presumption. We address, and ultimately reject, the University's arguments here.

We first review the legislative history. Section 515.7 was proposed as Assembly Bill No. 736 (Assem. Bill 736 or the Bill), an "urgency statute" whose uncodified provision stated that it was necessary to go into effect immediately "[t]o ensure the continued ability for non-profit, independent institution of higher education to provide education and training in critical fields of employment." (Assem. Bill 736 (2019–2020 Reg. Sess.) § 2.) The Bill information sheet from its Assembly sponsor stated that the Bill "clarifies that adjunct professors may be treated as exempt professionals." The information sheet also noted "[a]mbiguity in current law" about whether

12

adjunct faculty can be paid through flat rate compensation arrangements.[4]  It noted that some universities have shifted to hourly pay for adjuncts "in order to shield against wage-and-hour violation lawsuits" and that this shift created an administrative burden for universities "and is also strongly disliked by most adjuncts who want the flexibility, independence, and respect their position is traditionally granted."

This statement of purpose was echoed and amplified by a letter in support of the Bill from representatives of the Association of Independent California Colleges and Universities and the Service Employees International Union.  In particular, the letter stated the Bill "clarifie[d]" existing law.  It also described "expensive litigation" that universities and colleges were facing:  "These lawsuits, typically over technical infractions such as paystub information errors, are resulting six- or seven-figure financial losses, which redirects scarce institutional funds away from other important academic services . . . ."  The letter stated that the Bill would allow nonprofit colleges and universities "to continue treating adjunct faculty as exempt employees."

The University claims that section 515.7's remedial purpose is to save institutions like it from expensive litigation and penalty awards, and that this intent is best served by giving the statute a retroactive effect.  This argument overlooks that "such a remedial purpose does not necessarily indicate an intent to apply the statute retroactively.  Most statutory changes are, of course, intended to improve a preexisting situation and to bring about a fairer state of affairs, and if such an objective were itself sufficient to

---

[4] Other analysis of Assembly Bill 736, however, describe it not as a clarification but a change to existing law because it added additional salary tests to qualify adjunct faculty for exempt professional status.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 736 (2019–2020 Reg. Sess.) as amended Aug. 7, 2020, p. 5.)

demonstrate a clear legislative intent to apply a statute retroactively, almost all statutory provisions and initiative measures would apply retroactively rather than prospectively." (*Evangelatos v. Superior Court*, *supra*, 44 Cal.3d at p. 1213; see also *Aetna Casualty & Surety v. Industrial Accident Commission*, *supra*, 30 Cal.2d at p. 395 ["legislative intent in favor of the retrospective operation of a statute cannot be implied from the mere fact that the statute is remedial and subject to the rule of liberal construction"].) Nor does the specter of litigation against universities and colleges persuade us, without clearer indication, that the Legislature intended section 515.7 to apply retroactively: the reference to litigation in the Bill sponsor's information sheet does not make any such intent clear, and the Bill itself makes no mention at all of the litigation.[5] It is reasonably apparent that the Legislature wanted to address the legal issues that led to university-adjunct litigation and provide a pathway to exempt status for adjuncts; it does not follow that the Legislature necessarily also wanted to extinguish any penalties that some colleges or universities had already accrued by failing to comply with existing law.

---

[5] Indeed, the litigation is mostly emphasized in the letter submitted by private supporters of the Bill; their reasons for supporting the Bill are not necessarily the same as those of legislators.

In a similar vein, the University has requested we take judicial notice of examples of litigation it argues section 515.7 was intended to abate: a series of complaints and settlement approvals involving other colleges and universities. There is no indication these documents were before the Legislature (indeed, some of them were filed after enactment of section 515.7), and they add nothing to our consideration of references to litigation in the legislative history already before us. We deny the request as to these documents. (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, overruled on other grounds by *In re Tobacco Cases II* (2007) 41 Cal.4th 1257 ["Although a court may judicially notice a variety of matters [citation], only *relevant* material may be noticed"].)

14

The University also urges us to find section 515.7 retroactive because it was enacted by an "urgency" measure that took effect immediately upon enactment, and because at least some portions of the legislative history indicate that the Legislature viewed the statute as a clarification of the law rather than a change to it. Our Supreme Court identified both factors as supporting retroactive application of a statute in *Western Security Bank v. Superior Court*, *supra*, 15 Cal.4th at pages 244–245. But the decision in that case was based on an examination of the legislation's entire history, language, and context. (*Id.* at p. 245 [finding that Legislature's retroactive intent was plain because the bill stated that it was intended to abrogate a specific court of appeal holding and " 'confirm the expectation of the parties' " that an earlier interpretation of applicable law would apply].) The presence of urgency and clarification factors alone is not controlling. (See *McClung v. Employment Development Dept.*, *supra*, 34 Cal.4th at pp. 475–476 [despite statute's provision that it clarified existing law, "We see nothing here to overcome the strong presumption against retroactivity"]; *Gallo v. Superior Court* (1988) 200 Cal.App.3d 1375, 1379 [declining to find retroactive application of statute in view of legislative silence on retroactivity, notwithstanding urgency designation]; *Estate of Messner* (1987) 190 Cal.App.3d 818, 821 [same].) We conclude those factors are insufficient here to overcome the strong presumption against retroactivity, especially given the plain language of the statute that frames one of the salary tests as applicable in years 2020 and beyond.

## 2.

The University advances a second argument for the retroactive application of section 515.7 in reliance on the abatement doctrine. The abatement doctrine provides that, "Although the courts normally construe

15

statutes to operate prospectively, the courts correlatively hold under the common law that when a pending action rests solely on a statutory basis, and when no rights have vested under the statute, 'a repeal of such a statute without a saving clause will terminate all pending actions based thereon.' " (*Governing Board v. Mann* (1977) 18 Cal.3d 819, 829.)  This doctrine applies, however, only in "limited circumstances."  (*Rankin v. Longs Drug Stores California, Inc.* (2009) 169 Cal.App.4th 1246, 1253.)  Where a statute does not "wholly repeal but merely revises existing law, so that the statutory cause of action in modified form remains, no abatement occurs."  (3 Witkin, Cal. Procedure (6th ed. 2022) Actions, § 20.)  The test for repeal in the abatement cases has sometimes been articulated as whether the new legislation "constitutes 'a substantial reversal of legislative policy' that represents 'the adoption of an entirely new philosophy' vis-à-vis the prior enactment." (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1025.)

Applying that test for repeal, we reject the University's argument that the abatement doctrine applies to this case.  With section 515.7, the Legislature narrowed the applicability of specified subdivisions of section 226 to adjunct faculty.  But those subdivisions were not repealed entirely, nor were they even repealed as to adjuncts.  Rather, the Legislature modified and expanded the conditions that nonprofit higher education institutions could satisfy to avoid wage-statement liability.  Some adjuncts may still be able to obtain relief under section 226, but they must make a different and more demanding showing to do so.  Under these circumstances, we conclude that this is an adjustment to an existing cause of action rather than a repeal of it. Accordingly, the abatement doctrine does not apply, and we apply the ordinary rule of prospective statutory construction.

Our conclusion is consistent with *Krause v. Rarity* (1930) 210 Cal. 644, and with *Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, overruled on other grounds in *Z.B., N.A. v. Superior Court* (2019) 8 Cal.5th 175. In *Krause*, our high court considered a law that repealed an existing statutory cause of action for wrongful death of a guest in a vehicle arising from negligence and replaced it with a new statute providing for recovery only in cases of intoxication, willful misconduct, or gross negligence of the driver. (*Krause*, at pp. 651–652.) The California Supreme Court rejected the abatement theory because the statute under which the claim was brought was not "repealed entirely" and guest liability was not abolished but merely narrowed. (*Id.* at p. 655.) Because the abatement theory was inapposite, the ordinary rule of statutory construction—that statutes operate prospectively unless their retrospective effect is clearly apparent—continued to apply. Similarly, in *Thurman*, a PAGA case, the Fourth District Court of Appeal considered a new statute that required PAGA plaintiffs to exhaust administrative remedies before bringing suit. (*Thurman*, at p. 1152.) Rejecting the argument that the new exhaustion statute abated existing unexhausted cases by removing their statutory basis, *Thurman* concluded that the exhaustion statute "did not constitute a substantial reversal of the legislative policy underlying the PAGA" but rather a modification intended to refine and improve it. (*Ibid.*) Here, a statutory cause of action for adjunct faculty to challenge the omission of information from their wage statements remains, albeit in narrower form, as in the statutes at issue in *Krause* and *Thurman*.

17

We acknowledge that cases applying the abatement doctrine are not wholly consistent.[6]  There is considerable well-reasoned argument on both sides of this issue, as our dissenting colleague's separate opinion illustrates.  On balance, however, in addition to the reasoning and authority we have just set out, we think that declining to apply abatement doctrine in a close case like this one advances the enterprise of statutory construction.  To explain: the abatement doctrine creates an exception to the ordinary and strong rule that statutes apply prospectively unless the Legislature's retroactive intent is apparent.  (See *ante*, at pp. 11–12.)  Yet, like the nonretroactivity presumption, abatement is a doctrine that supplies a rule of decision when the Legislature is silent about the effect of its enactment on pending cases, i.e., when it does not include a saving clause that directs courts to maintain pending cases.  Where two statutory construction tools operate in similar contexts and result in opposite outcomes, it is unsurprising that the

---

[6] For instance, in *People v. Bank of San Luis Obispo* (1910) 159 Cal. 65, our Supreme Court recited the abatement doctrine in considering the retroactive effect of a repealed statute that previously allowed the Attorney General to seek a decree declaring a bank insolvent.  The Supreme Court declined to abate the Attorney General's action because the appeal was not a direct appeal of a judgment but rather a collateral appeal from a denial of new trial, noting of the abatement doctrine that its "general expressions . . . are to be read in each case in the light of the facts which are there disclosed." (*Id.* at p. 79.)  Moreover, in some cases purporting to rely on the abatement doctrine, this reliance was unnecessary because the statutory language included legislative commands about the effective date of the statute's provisions.  For example, the University relies on *Governing Board v. Mann*, *supra*, 18 Cal.3d at page 831, which states that a school district's pending action to terminate a teacher for a marijuana-related conviction was abated by passage of a new law that repealed its right to bring such an action.  But the new law itself stated that termination actions could be brought only for marijuana-related conduct " '*occurring prior to January 1, 1976*,' " a date long past the teacher's conviction in *Mann*.  (*Id.* at p. 827.)

abatement cases demonstrate inconsistency.  But an inconsistent tool of statutory construction is a poor tool; canons of construction are " 'aids to ascertaining probable legislative intent' " (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 879) and are therefore most useful when the Legislature can fairly predict their applicability.  This supplies an additional reason to reject abatement here:  declining to apply the abatement doctrine in close cases creates greater consistency and predictability, and thus permits courts to adhere more faithfully to the Legislature's intent. [7]

### C.  No Error in "Knowing and Intentional" Finding

An employer's violation of the wage statement provisions must be "knowing and intentional" for an employee to recover penalties.  (§ 226, subd. (e)(1).)  The University contends that the trial court erred in finding its violations here to be knowing and intentional.

The trial court found that "the evidence is not that the [U]niversity had a good faith belief [that adjunct instructors were exempt under state law]; the evidence is that they never thought about it."  This factual finding is entitled to deference on review (*Furry*, *supra*, 30 Cal.App.5th at p. 1078), and the University does not challenge it as unsupported by substantial evidence.  Instead, the University argues that the trial court made a mistake of law in applying the "predicate facts" test, an interpretation of section 226, subdivision (e)(1) adopted by two of our sister divisions in this appellate district.  (*Furry*, at p. 1085; *Kao v. Holiday* (2017) 12 Cal.App.5th 947, 961–962.)  Pursuant to the "predicate facts" test, if the employer knew facts

---

[7] Because we find that section 515.7 does not apply to Gola's claims, we express no view of her further argument that the University would not qualify for the exemption section 515.7 creates because adjunct faculty pay was conditioned on sufficient enrollment in their classes and was thus not a "salary" within the meaning of the statute.

existed that triggered its obligation to issue a wage statement, then its failure to comply was knowing and intentional within the meaning of section 226, subdivision (e)(1) regardless of whether it believed it had to comply or whether its belief was reasonable.  (*Furry*, at p. 1085; *Kao*, at pp. 961–962.) The University urges us to reject this test and instead apply a "good faith" test, applied by some federal district courts, and by the Second District Court of Appeal in a recent decision,[8] that allows an employer to escape liability for wage statement violations where a court finds that the employer should have issued compliant wage statements but had a good faith belief that its practices were lawful.

We conclude that the trial court applied the correct legal test.  Section 226, subdivision (e)(3) makes clear that the term " 'knowing and intentional' " does *not* include "an isolated and unintentional payroll error due to a clerical or inadvertent mistake," and an employer's compliance with section 226 in the past can shed light on whether its current failure is knowing and intentional.  These clarifications indicate that the Legislature intended to exclude only truly errant or mistaken violations from the reach of section 226's penalty provisions, not competing legal interpretations.  The predicate-facts test appropriately reflects this intent.

Moreover, we are not persuaded by the cases adopting a different test that the University urges us to follow.  Some have adopted the "good-faith" test because they have equated section 226, subdivision (e)(1) with section 203, the penalty statute for employers who fail to timely pay employees.  (See *Chavez v. Converse, Inc.* (N.D.Cal., Mar. 13, 2020, No. 15-CV-03746-NC) 2020 U.S. Dist. LEXIS 44097, pp. *3–6; *Magadia v. Wal-Mart Associates, Inc.*

---

[8] *Naranjo v. Spectrum Security Services, Inc.* (2023) 88 Cal.App.5th 937 (*Naranjo*).

20

(N.D.Cal. 2019) 384 F.Supp.3d 1058, 1084, revd. in part, vacated in part on other grounds (9th Cir. 2021) 999 F.3d 668.) But the words used by the Legislature in section 226, subdivision (e)(1) and section 203 are significantly different. Section 203 imposes penalties where "an employer willfully fails to pay" wages due, and an implementing regulation further explains that an employer who presents a defense, other than one that is "unsupported by any evidence, [is] unreasonable, or [is] presented in bad faith," is not liable for penalties even if its defense is ultimately unsuccessful. (§ 203, subd. (a); Cal. Code Regs., tit. 8, § 13520.) Unlike section 203, the Legislature did not use the word "willful" in section 226, subdivision (e)(1); instead, it chose the words "knowing and intentional," indicating a different scienter test. (Cf. *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 ["Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning"].) And providing a good-faith defense to employers accused of failing to pay wages is consonant with the scope of the employer's obligation: "In case of a dispute over wages, the employer shall pay, without condition . . . all wages, or parts thereof, *conceded by him to be due*, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed." (§ 206, subd. (a), italics added.) There is no comparable provision in section 226 that excuses employers from providing disputed wage statements.

We acknowledge that with *Naranjo*, a sister Court of Appeal has now adopted the good-faith test. (*Naranjo*, *supra*, 88 Cal.App. 5th at p. 951 ["a good faith dispute over whether an employer is in compliance with section 226 precludes a finding of a knowing and intentional violation"].) We note, however, that even under the test as set out in *Naranjo*, the University would

21

not prevail on this argument. *Naranjo* holds that the question of whether an employer acted in good faith is a fact question that is subject to substantial evidence review on appeal. (*Ibid.* ["substantial evidence supports the trial court's finding that Spectrum presented defenses in the first phase of trial in good faith"].) Here, the trial court found that the University did not present evidence at trial of a good-faith dispute over the applicability of section 226. The University has not challenged this factual finding as unsupported by substantial evidence and accordingly cannot prevail on this contention even applying the test that *Naranjo* adopts.

### D. Purpose of Section 226

As a final argument for reversal, the University argues that it cannot be liable here because section 226(a) "requires an accurate itemized statement" of wages. The University contends that it would be inaccurate and misleading to inform adjuncts of an effective hourly rate of pay on their wage statements because that was not the actual basis of their pay; instead, they were paid per course, on a salary schedule set by the CBA. The University thus effectively contends that we should disregard the clear statutory language requiring the wage statements of non-exempt employees to include "total hours worked by the employee" (*id.*, subd. (a)(2)) and "all applicable hourly rates in effect during the pay period" (*id.*, subd. (a)(9)). In other words, the University contends that we should give no effect to text of the statute because that text does not serve the statute's purpose of providing employees with accurate wage information.

Even if we were persuaded by the University's purpose arguments, we are not free to disregard the statute's text. " ' " '[U]nder the guise of

22

construction, a court should not rewrite the law . . . [or] omit from it what has been inserted[.]' " ' " (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 393.)  The Legislature is well aware that wage statements for non-exempt employees who are not paid by the hour must nonetheless show an effective hourly rate; it expressly added that requirement to section 226 in 2001 by deleting language limiting this requirement to the wage statements of employees who received hourly compensation.  (Assem. Bill No. 2509 (1999–2000 Reg. Sess.) § 10.)  And in any event, the University's purpose argument is not persuasive.  We can readily conceive a benefit in requiring employees who are not paid by the hour to report their hours and then disclosing to them their effective hourly rate; it enables employees to understand their compensation in a way that allows them to compare their pay to other job opportunities.

## II.  Federal Preemption of Failure to Pay and Waiting Time Claims

Gola's first cause of action for failure to pay wages, and her third cause of action for failure to pay wages upon dismissal, depend on the same factual premise:  according to Gola, the assignment letters she and all adjuncts received set out the start and end dates of their employment for each semester, as well as their salary for work within that period, and only within that period.  But, Gola contends, adjuncts were required to work before and after the assignment period, and the salary named in the assignment letters did not cover that work.  The trial court determined that these causes of action could only be resolved by construing the CBA, including whether its salary schedule included compensation for before- and after-semester work. Accordingly, the trial court determined that Gola's first and third causes of action were preempted by federal law, and Gola cross-appeals those

23

determinations. Our review is de novo. (See *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

"Section 301(a) of the Labor Management Relations Act, 1947 (29 U.S.C. § 185(a)) . . . provides: 'Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States . . . .' " (*Melendez v. San Francisco Baseball Associates LLC* (2019) 7 Cal.5th 1, 7.) In order to " 'promot[e] arbitration and the uniform interpretation of collective bargaining agreement provisions,' " section 301 of the LMRA has been construed by the United States Supreme Court to cover and preempt state-law actions seeking to enforce the CBA itself and those state-law claims that " ' "require interpretation or construction of a labor agreement." ' " (*Melendez*, at p. 8.) But determining whether interpretation of a labor agreement is required presents an exercise in judgment: "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished[.]" (*Livadas v. Bradshaw* (1994) 512 U.S. 107, 124.) Instead, "Preemption occurs when a claim cannot be resolved on the merits without choosing among competing interpretations of a collective bargaining agreement and its application to the claim." (*Melendez*, at p. 9.) If the state court must answer "questions relating to what the parties to a labor agreement agreed" when they adopted the CBA, then the claim is preempted. (*Allis-Chalmers Corp. v. Lueck* (1985) 471 U.S. 202, 211.)

The " 'touchstone' for [LMRA] section 301 preemption analysis is the nature of the plaintiff's underlying claim." (*Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 763.) Reviewing Gola's claim, as alleged in the operative complaint, we conclude that resolution of the factual dispute that

24

underlies the first and third causes of action—whether adjuncts' salary covered only the teaching semester, or whether it covered work before and after the semester as well—cannot be resolved without interpreting the CBA.

Gola's operative complaint contends that adjuncts' work dates were the semester start and end dates set out in their assignment letters. In her trial brief on the LMRA section 301 preemption issue, Gola attached the assignment letters containing the dates. Each of the assignment letters includes a link to the CBA and states that "[t]he terms of the appointment are consistent with the terms of the [CBA]." To resolve the issue of whether Gola was unpaid for work she performed before and after the semester, a factfinder would have to resolve whether the assignment letters incorporated the CBA, and what effect the CBA had on the terms of Gola's employment. Other questions about the interpretation of the CBA would also arise. For instance, article 11.2 of the CBA provides that written notification of an appointment—which, a factfinder could find, refers to the appointment letters that Gola relies on—"shall include the beginning and ending dates of appointment" as well as the salary. This provision supports Gola's interpretation of the period of her employment, yet the CBA also sets out the before- and after-semester work that adjuncts must perform. Article 20 of the CBA states that whatever compensation the parties have agreed on is the "total compensation" for adjuncts' work, and article 23 of the CBA states that its wage provisions comply with state law. These latter provisions support the University's interpretation that the term of employment goes beyond the semester itself. A factfinder adjudicating Gola's claims would have to decide how to interpret these potentially conflicting CBA provisions in order to decide what period of time the salary covered. We express no view on the correct resolution of these questions, but the fact that they are questions

25

about "what the parties to a labor agreement agreed" when they adopted the CBA means that federal law preempts state courts' resolution of them. (*Allis-Chalmers Corp. v. Lueck, supra,* 471 U.S. at p. 211.)

Gola offers two primary arguments against this conclusion. She contends first that federal preemption does not lie where a CBA interpretation issue is raised exclusively by a defendant and not by a plaintiff in stating her claim. Gola relies on *Caterpillar Inc. v. Williams* (1987) 482 U.S. 386 for this argument, but the CBA interpretation issue in that case was integral to the affirmative defense of waiver. Here, by contrast, an interpretation of the CBA is required not to resolve an affirmative defense, but the very claims Gola has pled. (See *Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 40–41 ["To determine whether a state claim will be preempted by section 301 of the LMRA because it would require interpretation of the CBA we look to the elements of the claim, the terms of the agreement, the facts which plaintiff believes support the cause of action and those the defendant may assert in his defense"].) Nothing in *Caterpillar* requires us to consider only plaintiff's *contentions*, or to accept without question plaintiff's characterization of the scope of her claims. And in any event, the CBA is referenced in the assignment letters that Gola herself relies on to frame the assignment period her claims concern.

Second, Gola contends that even if the CBA must be consulted in this case, it need not be *interpreted*, and the University has pointed to no ambiguities in the CBA that a court would have to resolve to decide her claims. It is true that Gola's claims do not turn on the disputed meaning of an individual word or phrase in the CBA; rather, a factfinder would have to discern the intent and effect of several provisions of the CBA and the extent to which they were incorporated into the assignment letters the University

26

sent to adjuncts, as we have described above. That is no less a task of interpretation than selecting among different definitions of an individual word or phrase.

Because Gola's first and third causes of action are preempted by section 301 of the LMRA, we affirm the trial court's dismissal of these claims.

### III. Attorneys' Fees

The trial court awarded attorneys' fees and costs to Gola because of her success on the section 226 cause of action. The University appeals the fee award based on its contention that the section 226 claim was incorrectly decided, but it does not contend that the trial court abused its discretion in setting the amount of fees. Because we have affirmed the section 226 judgment, we affirm the trial court's award of fees and costs.

### DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

_____

Van Aken, J.*


I concur:


_____

Stewart, P.J.


*Gola v. University of San Francisco* (A161477, A162437)


* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Gola v. University of San Francisco*, A161477, A162437

Concurring and Dissenting Opinion of Miller, J.

I respectfully dissent from part I.B.2 of the majority opinion regarding the application of the abatement doctrine. As I explain, I would vacate the judgment and remand to the trial court to consider whether some or all of the Labor Code section 226, subdivision (a)[1] wage statement claims are now abated by virtue of section 515.7, enacted after judgment was entered in this case.

Plaintiff Kelly Gola and the members of the class she represents are adjunct professors. They sued the University of San Francisco (University) in part because their wage statements did not comply with the strict requirements of section 226. After a bench trial, the court found the wage statements did not include the adjunct professors' total hours worked during the pay period and the effective hourly rate, as then required by the statute. For this violation of sections 226, subdivisions (a)(2) and (a)(9), the trial court awarded statutory damages of $1,621,600 and PAGA penalties of $545,235, plus attorney fees in excess of $1.3 million, and more than $21,500 in costs.

But after the trial court issued its statement of decision and after judgment was entered, the Legislature enacted section 515.7 which, as the majority opinion explains, exempts faculty at nonprofit higher education institutions such as the University from the wage statement requirements of section 226, subdivisions (a)(2) and (a)(9), provided they are employed in a professional capacity as defined in the statute and paid a salary that meets at least one of three tests for minimum compensation. I focus on the third of the three tests, because it is the one that in my view may result in the abatement

_____

[1] All statutory references are to the Labor Code except as noted.

1

of some or all of Gola's section 226, subdivision (a) claims: "[w]hen employed under a collective bargaining agreement, payment pursuant to that collective bargaining agreement, if the classification of employment in a professional capacity is expressly included in the collective bargaining agreement in clear and unambiguous terms." (§ 515.7, subd. (a)(2)(C) (the "third test").)

We know from the record that the adjunct faculty members at the University (more than 600 people) are represented by a labor association and that for the time period covered by Gola's lawsuit, two collective bargaining agreements (CBA's) were in effect, one that took effect on July 1, 2015, and another dated July 1, 2018 and executed on August 2, 2019. Among other things, the July 1, 2018 CBA expressly states that the parties agreed "the classification of bargaining unit faculty are as professional employees."

Thus, it appears that the University's conduct would no longer violate the wage statement requirements of section 226, subdivision (a), by virtue of the Legislature's enactment of section 515.7.[2] In that case, there would be no statutory penalties under the Labor Code or under PAGA and no attorney fees to recover.

The doctrine of abatement was designed for consideration in this circumstance.

My colleagues correctly state the principle underlying the abatement doctrine, as articulated by our Supreme Court in *Governing Board v. Mann* (1977) 18 Cal.3d 819, 829 (*Governing Board*): "Although the courts normally

---

[2] Gola's counsel eventually conceded at oral argument that if there is a CBA containing the clear language required by the third test in section 515.7, and another adjunct professor were to approach him today with the same section 226 claim as Gola's (i.e., that the wage statements did not include the total hours worked during the pay period and the effective hourly rate), he would advise against filing that claim.

construe statutes to operate prospectively, the courts correlatively hold under the common law that when a pending action rests solely on a statutory basis, and when no rights have vested under the statute, 'a repeal of [such] a statute without a saving clause will terminate all pending actions based thereon.'"

As the court in *Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013 (*Zipperer*) went on to amplify, "In other words, where 'the Legislature has conferred a remedy and withdraws it by amendment or repeal of the remedial statute, the new statutory scheme may be applied to pending actions without triggering retrospectivity concerns. . . .' (*Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 690.)  Furthermore, legislative action 'can effect a partial repeal of an existing statute.' (*Ibid.*) ' "The justification for this rule is that all statutory remedies are pursued with full realization that the legislature may abolish the right to recover at any time." ' (*Governing Board*, at p. 829.)  That common law principle has been codified in California, as follows:  'Any statute may be repealed at any time, except when vested rights would be impaired.  Persons acting under any statute act in contemplation of this power of repeal.'  (Gov. Code, § 9606.)  The substance of the legislation determines whether it constitutes a repeal. (*Southern Service Co., Ltd. v. Los Angeles* (1940) 15 Cal.2d 1,13.)"  (*Zipperer*, at p. 1023.)

Where I part company with my colleagues is in the application of the abatement doctrine to this case.

*Zipperer* sets out a four-factor test for abatement:  (1) "the statutory nature of the plaintiffs' claim"; (2) "the unvested nature of plaintiffs' claimed rights;" (3) "the timing of the elimination of those rights"; and (4) "the nature of the mechanism by which the right of action was eliminated."  (*Zipperer,*

3

*supra,* 133 Cal.App.4th at p. 1023.)  Considering the four-factor test on this record, my view is that the case must be remanded.

Applying the *Zipperer* factors here is straightforward.  First, the section 226 claim is wholly statutory; the right of an employee to a certain form of wage statement did not exist in common law.  Second, the plaintiff's rights to statutory penalties under section 226 has not yet vested.  (See *Zipperer, supra,* 133 Cal.App.4th at p. 1024 [" ' "No person has a vested right in an unenforced statutory penalty or forfeiture." ' [Citations.]  Until it is fully enforced, a statutory remedy is merely an ' "inchoate, incomplete, and unperfected" ' right, which is subject to legislative abolition"]; *Willcox v. Edwards* (1912) 162 Cal. 455, 466-467 [" 'A statute which wholly repeals an earlier one, either expressly or by implication, without any saving clause, makes it ineffectual to support any proceedings, whether not yet begun, or pending at the time of its passage, and *not already prosecuted to final judgment* vesting absolute rights' " (italics added)].)  Third, section 515.7 was enacted before this case has become final.  (See *Zipperer,* at p. 1024 ["Whenever the Legislature eliminates a statutory remedy 'before a judgment becomes final,' the legislative act 'destroys the right of action' "].)

Fourth, when certain conditions of section 515.7 are met (relevant here, a CBA that meets the requirements of the third "test"), an employee cannot maintain a wage statement claim based on Labor Code section 226, subdivisions (a)(2), (3), and (9).  Although employers such as the University still must provide wage statements to their covered employees under section 515.7, they are no longer statutorily required to provide the precise information that is the subject of this lawsuit.  In effect, the wage statement requirements at issue in this case have been repealed for certain employers

4

(including the University) with respect to certain employees, including adjunct professors who meet the third test.

Even if section 515.7 does not effect a wholesale repeal of all employees' rights to bring a claim under section 226 for wage statements that lack required information, section 515.7 is sufficient to trigger abatement if the employer can show that an employee is seeking to recover unvested statutory wage statement penalties for which their employers are now exempt (here, because of a CBA that meets the requirements of the third test).  The case of *Rankin v. Longs Drug Stores, Inc.* (2009) 169 Cal.App.4th 1246 (*Rankin*) illustrates the point.

In *Rankin*, a plaintiff sued Longs Drug Stores alleging that Longs violated sections 432.7 and 432.8 by asking on an employment application whether the job applicant had been convicted during the last seven years of a felony, a crime involving use or possession of illegal drugs, or any misdemeanor which resulted in imprisonment.  Rankin sought statutory penalties.  The trial court granted Rankin's class certification motion and defined the class period for certain dates between 2003 and 2005.  But after the lawsuit was filed, Congress enacted a statute that permitted retail pharmacies to ask job applicants if they had ever been convicted of a crime involving or related to controlled substances, notwithstanding any state law. (*Rankin, supra,* 169 Cal.App.4th at p. 1251.)  As here, the Labor Code statutes did not go away; but if a defendant could establish it was a retail pharmacy then the enactment of another law (the federal statute) operated to abate plaintiff's class action under the Labor Code.  After a trial, the trial court entered a judgment of dismissal under abatement principles, and Rankin appealed.

5

The court in *Rankin* acknowledged that the "familiar rule" is that when the Legislature is silent on its intent, the new statutory scheme is ordinarily construed to operate prospectively. (*Rankin, supra,* 169 Cal.App.4th at p. 1253.) "However, different considerations are implicated in the limited circumstances in which the Legislature enacts a statute that completely reverses substantive law by effectively permitting previously prohibited conduct." Those enactments, when devoid of an express savings clause, "have led the courts to apply the common law principle of abatement to conclude all still pending actions brought under the old statute must be abated and dismissed." (*Id.* at p. 1253.) The *Rankin* court discussed the breadth of this principle in civil and criminal cases, and, surveying cases (including *Zipperer*), wrote, "[w]hen a pending action seeks recovery based on a statutorily-based obligation, and that statutory provision is repealed by legislation not containing an express saving clause, the California courts have consistently concluded the pending actions should be abated." (*Rankin,* at p. 1256.) The *Rankin* court recognized that the federal statute here "effect[ed] a partial repeal of the [California] remedial statute that forms the basis for this action." Finding that, as in *Zipperer*, plaintiffs had no vested right in maintaining their statutory claim, and that their unenforced statutory remedy was " ' " 'inchoate, incomplete, and unperfected' " ' " and subject to " 'legislative abolition,' " the *Rankin* court concluded the "pending action to enforce the repealed statutory remedy" was abated. (*Rankin*, at p. 1262.)

My colleagues view the fact that section 515.7 does not wholly repeal specific subdivisions of section 226 to adjunct faculty as a stumbling block to finding abatement; they were not "repealed entirely, nor were they even repealed as to adjuncts." (Maj. opn. at p. 17.) But this is not a requirement

6

imposed by the case law.  In *Rankin*, section 432.7 was not repealed entirely; but under certain circumstances and in specific cases (for example, particular questions to job applicants at retail pharmacies), abatement was required. So too in *Zipperer*.[3]

In my view, my colleagues also misplace their focus when they apply as the test for repeal whether the new legislation is a " ' "substantial reversal of legislative policy" ' " that represents " ' "the adoption of an entirely new philosophy." ' "  (Maj. opn. at p. 17.)  These phrases come from *People v. One 1953 Buick 2-Door* (1962) 57 Cal.2d 358 (*One 1953 Buick*), a case involving a forfeiture proceeding after the seizure of a car used to unlawfully transport narcotics.  The opinion itself does not mention abatement.  And read in context, these phrases do not articulate the criteria for whether abatement should apply, nor do they define a new test.

The only question to be determined on appeal in *One 1953 Buick* was whether, as the State argued, the former code provisions on forfeiture that were in effect when the car was seized should have been applied, or whether, as the commercial credit company that was the legal owner of vehicle argued, the trial court was correct in applying the amended statutes that went into effect after the seizure but before the forfeiture proceeding commenced.  In

---

[3] In *Zipperer*, the plaintiffs brought a claim against Santa Clara County based on a provision in the Solar Shade Control Act limiting a property owner's ability to grow trees and shrubs that cast shadows on another property owner's solar collector.  The county, however, exempted itself from this provision, which it was permitted to do under the act.  The Solar Shade Control Act was not repealed by the county's legislative act, but the *Zipperer* court nonetheless concluded that abatement applied.  The *Zipperer* plaintiffs still had rights under the Solar Shade Control Act, but the county's legislative act had the effect of permitting conduct by the county that previously was prohibited.  Plaintiffs, therefore, could no longer bring a claim against the county.

essence, the former law required a bona fide lien holder who sought to assert its rights in a forfeiture action to establish that it had undertaken an investigation into the "moral responsibility, character, and reputation" of the purchaser and that it was "without any knowledge" that the vehicle would be used for the unlawful purposes (here, unlawful transportation of a narcotic) referred to in another statute (Health & Saf. Code, § 11610). The former law was repealed, and new language was added to various statutes permitting a bona fide lien holder in a forfeiture proceeding to show "that he acquired his interest without actual knowledge" that the vehicle was to be used for the purposes referred to in section 11610. (*One 1953 Buick, supra,* 57 Cal.2d at pp. 361-362.)

The Supreme Court in *One 1953 Buick* described as the "governing rule" that " 'it has been held in a long line of cases that the repeal of a statute creating a penalty, running either to an individual or the state, at any time before final judgment, extinguishes the right to recover the penalty,' " and further that "a forfeiture of this nature 'is a penalty to induce performance of [a] duty,' and its penal character being obvious, the repeal of the statute authorizing the forfeiture extinguishes the right of forfeiture." (*One 1953 Buick, supra,* 57 Cal.2d at pp. 362-363, quoting *Lemon v. Los Angeles Terminal Ry. Co.* (1940) 38 Cal.App.2d 659, 670, 671.) Having stated the rule, its application to the facts of this forfeiture case was clear: the trial court was correct.

But the Supreme Court went on to explain how this case presented "an excellent example of the wisdom of the rule" it had just stated, noting how the statutory requirement that every prospective lien claimant make a reasonable investigation into the moral responsibility, character, and reputation of the purchaser had been in the law since 1933, and had once

8

been described as having the "purpose of . . . 'requir[ing] one who finances the purchase of an automobile to aid in the prevention of crime.' " (*One 1953 Buick, supra,* 57 Cal.2d at p. 363.) So when the legislature repealed the law in 1959, "this was not only a change in the 'terms and conditions' of forfeiture but was also a substantial reversal of legislative policy and represented the adoption of an entirely new philosophy relative to the rights of a bona fide lienholder in a forfeited vehicle," as reflected in the repeal and in the amended statutes making it easier for lienholders to defend against forfeiture. The Supreme Court concluded that it was "thus clear that it is the present legislative conclusion that public policy does not require the forfeiture" of a legal owner's interest in a car that was used to transport narcotics where that owner failed to make an investigation into the moral responsibility and character of the purchase. And because the "only purpose" of that condition of forfeiture had been to "induce" legal owners into making such investigations, and "since the Legislature has now determined that public policy does not require such an investigation," the court concluded that "*it is difficult to conceive of any public purpose which could be served at this date* by forfeiting the legal owner's interest in the automobile for his failure to make this investigation." (*Id.*at pp. 363-364, italics added.)

As I read *One 1953 Buick*, the test of abatement (a word not mentioned in the opinion itself) is not how substantial was the reversal in legislative policy, or whether a measurable philosophical change was afoot. Indeed, in many cases that information may not even be knowable. Instead, the rule was straightforward, and the facts of *One 1953 Buick* were but an "excellent example" of the wisdom of the rule. I read the opinion as providing helpful expression as to why the doctrine of abatement applies to the matter before us. Paraphrasing *One 1953 Buick*, if the purpose of section 226, subdivision

9

(a) is to enumerate the requirements of wage statements to induce employers to meet them or face statutory penalties, and now that the Legislature has determined that section 226, subdivision (a) is not violated if the third test (the CBA) of section 515.7 applies, "it is difficult to conceive of any public purpose which could be served at this date" by requiring the University to pay the multi-million dollar judgment without first remanding to the trial court to consider whether the application of the statute to this case requires abatement of some or all of Gola's section 226, subdivision (a) cause of action.[4]

Because the trial court did not have an opportunity to consider the evidence in this light, and there may be additional evidence or argument pertinent to the issue, I would vacate the judgment and remand to the trial court to consider whether the wage statement claims are abated by section 515.7 for some or all of the class period at issue.[5]

For these reasons, I respectfully dissent from the majority's decision to affirm the judgment.

---

[4] Given my view of the applicability of the abatement doctrine, I do not see this as a "close case," and therefore cannot agree with the majority that declining to consider the doctrine here "advances the enterprise of statutory construction." Under the majority's reasoning, it seems that abatement would *always* yield to the contrary "nonretroactivity presumption." (Maj. opn. at p. 20.) But our Supreme Court has long recognized the "wisdom of the rule" that " 'the repeal of a statute creating a penalty, running either to an individual or the state, at any time before final judgment, extinguishes the right to recover the penalty.' " (*One 1953 Buick*, *supra*, 57 Cal.2d at p. 363.)

[5] As the majority notes, the second CBA states on its cover page that its effective date is July 1, 2018, but we have not determined the effective date of the CBA's classification of adjuncts as professional employees. (Maj. opn. at pp. 9-10, fn. 2.) Further, a finding of abatement would affect the statutory damages, PAGA penalties and potentially attorneys' fees and costs.

_____
Miller, J.

Trial Court:                San Francisco County Superior Court

Trial Judge:                Hon. Curtis Karnow

Attorneys for Plaintiff and   Goldstein, Borgen, Dardarian & Ho
Appellant:                  Morris J. Baller

                            Katz, Marshall & Banks, LLP
                            Daniel B. Edelman
                            *Pro Hac Vice*

                            Hammondlaw, P.C.
                            Julian Hammond
                            Polina Brandler
                            Ari Cherniak
                            Arie Michelsohn
                            *Pro Hac Vice*

Attorneys for Defendant      Vartain Law Group, P.C.
And Respondent:             Michael J. Vartain
                            Ross J. Vartain